IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No.:

TAMARA DAVIES, as personal representative of the ESTATE OF JAMES DAVIES;

 Plaintiff,

v.

THE CITY OF LAKEWOOD, COLORADO, and its Police Department;
AGENT DEVANEY (D.J.) BRALEY, in his official and individual capacities;
POLICE CHIEF KEVIN PALETTA, in his official and individual capacities;
SERGEANT MICHELLE CURRENT, in her official and individual capacities;
SERGEANT THOMAS GRADY, in his official and individual capacities; and
JOHN and JANE DOES 1-5, current and former employees of the Lakewood Police
Department, in their official and individual capacities.

 Defendants.

---

## COMPLAINT AND JURY DEMAND

---

 Plaintiff TAMARA DAVIES, as personal representative of the ESTATE OF

JAMES DAVIES, through her undersigned counsel, Murray Ogborn and Clayton E.

Wire of Ogborn Mihm LLP, for her Complaint and Jury Demand against THE CITY

OF LAKEWOOD, COLORADO, and its Police Department; AGENT DEVANEY

(D.J.) BRALEY,  in his official and individual capacities; POLICE CHIEF KEVIN

PALETTA, in his official and individual capacities; SERGEANT MICHELLE

CURRENT, in her official and individual capacities; SERGEANT TOM GRADY, in

his official and individual capacities; and JOHN and JANE DOES 1-5, current and

former employees of the Lakewood Police Department, in their official and individual capacities, alleges as follows:

## INTRODUCTION

1.      At 3:30 a.m. on November 9, 2012, Lakewood Police Department (LPD) Patrol Agent James Davies who had worked over 18 hours on his assigned and overtime shifts was standing on an overturned ladder, peering over a wooden fence into the backyard of a house located at 1940 Eaton Street, where the LPD had arrested three occupants approximately one hour earlier.  Agent Davies had been ordered by his supervisor, Sergeant Michelle Current, to maintain his position in that location.  Agent Davies' partner, Agent Albrets, had previously entered the residence at the direction of Sgt. Current.  Agent Davies stood on the ladder, alone, in full LPD uniform, believing that his fellow officers and supervisor knew that he was providing perimeter containment for the north and east sides of the house. Suddenly, without any prior warning, another LPD officer, Agent Devaney Braley, exited the north door of the house and began shining the bright flashlight mounted on his AR-15 rifle down the fence over which Agent Davies was observing the back yard.  Agent Davies calmly acknowledged Agent Braley's entrance into the yard by saying "Hey," in a normal tone of voice.  Agent Braley immediately focused his flashlight on Agent Davies and began to scream "Police. Drop the gun." Approximately 1.5 seconds later, Agent Braley fired a .223 caliber bullet through Agent Davies' left cheek and into the base of Agent Davies' brain.

2.      This tragic shooting of Agent Davies was the inevitable conclusion to a series of preventable acts and omissions that included, *inter alia*, (a) the LPD's inadequate, deficient, and deliberately indifferent policies, procedures, and customs; (b) the grossly deficient, objectively unreasonable, and deliberately indifferent supervision of Agent Braley and command of the scene at 1940 Eaton Street; and (c) the objectively unreasonable decision by Agent Braley to fire a deadly rifle shot at a fellow LPD officer.

3.      42 U.S.C. § 1983 provides, in pertinent part: "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . "

4.      Defendants, acting under color of state law, violated Agent Davies' right under the Fourth Amendment to be free from the unreasonable use of deadly force.

5.      The City of Lakewood, acting through its police department, established and enforced policies and/or customs that subjected Agent James Davies to, and caused Agent James Davies to be subjected to, a deprivation of his Constitutional rights.

6.     The individual Defendants, acting in their official and individual capacities, also subjected Agent James Davies to, and caused Agent James Davies to be subjected to, a deprivation of his Constitutional rights.

7.     As a direct and proximate result of Defendants' actions, the Estate of James Davies suffered injuries and damages.

## PARTIES, JURISDICTION AND VENUE

8.     Plaintiff, Tamara Davies, is a female citizen of the United States, residing in Littleton Colorado.

9.     Plaintiff, Tamara Davies, is the sole personal representative of the Estate of James Davies, and the mother of Agent Davies' two minor children.

10.     The City of Lakewood, Colorado, is a municipality organized pursuant to Colorado law, which has formed a police department (hereafter "the City" or "LPD").

11.     Defendant Devaney (D.J.) Braley, in his individual and official capacity, was and is employed by the City and LPD as an Agent and was and is a member of the West Metro SWAT.

12.     Defendant Kevin Paletta, in his individual and official capacity, was and is employed by the City and LPD as Police Chief.

13.     Defendant Michelle Current, in her individual and official capacity, was and is employed by the City and LPD as a Sergeant.

14.    Defendant Thomas Grady, in his individual and official capacity, was and is employed by the City and LPD as a Sergeant, and was and is a member of the West Metro SWAT.

15.    Defendants John and Jane Doe 1-5, in their individual and official capacities, were, and may still be, employees of the City and/or the LPD, who each caused Agent James Davies' constitutional rights to be violated.

16.    Notice pursuant to the Colorado Governmental Immunity Act, § 24-10-109, C.R.S., was timely sent to, *inter alia*, the City, on May 7, 2013.  A copy of the notice is attached hereto as "**Exhibit A**" and incorporated herein by reference. Plaintiff has not received any notice that her claim was denied.

17.    This court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, as it raises civil rights claims arising from the United States' Constitution and Statutes.

18.    The conduct complained of herein occurred in the State of Colorado. This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND AND ALLEGATIONS

### Agent James Davies Began Work on November 8, 2012, and Volunteered For, and Was Assigned, an Overtime Assignment

19.    During the morning of November 8, 2012, LPD Patrol Agent James Davies worked four "extra duty hours," as approved by the LPD.

20.    Following these four hours of "extra duty," Agent Davies began his assigned shift at 1:00 p.m.

21.     On information and belief, at some time during his shift, Agent Davies was contact by an LPD representative regarding available overtime assignments during the early morning shift on November 9, 2012.

22.     On information and belief, Agent Davies volunteered for, and his supervisor at the LPD approved his participation in, the assigned overtime during the early morning of November 9, 2012.

23.     At this time, the LPD had a well settled custom, policy, and/or procedure of assigning officers and employees overtime, because the police department was understaffed.

24.     At this time, the LPD also had well settled custom, policy, and/or procedure of permitting officers to work 16 "extra duty hours" per week, in addition to their regular shifts and assigned overtime.

### On November 9, 2012, Agent Davies Arrived at 1940 Eaton Street with Other Officers

25.     After completing his regular shift, and beginning his assigned overtime, Agent Davies was patrolling alone in an LPD police cruiser in the area of Sloan's Lake in Edgewater, Colorado.

26.     While investigating a reported loud party on Fenton Street in Edgewater, at approximately 1:50 a.m. on November 9, 2012, Agent Davies and LPD Patrol Agent Justin Mains heard gunshots.

27.     Eventually, numerous LPD employees congregated to the area of 20th and Eaton Street in response to the reports of gun shots.

28.     At approximately 2:06 a.m., Defendant Sergeant Michelle Current and LPD Agents Justin Mains, Kyle Okamura, Kevin Lord, and Dustin Smith walked south on Eaton Street from 20th Avenue, to investigate the report of shots fired.

29.     Pursuant to Lakewood PD policy PP-2O64, *Command at Crime Scenes*, Defendant Sergeant Current was "Incident Commander" at the scene, and thus was responsible for the overall control and coordination of the operation.

30.     LPD had no Supervising Commander on duty or on call to whom Sergeant Current could report or from whom she could seek counsel.

31.     As they advanced south down Eaton Street, Agent Okamura spotted a broken window on the residence at 1980 Eaton Street.

32.     At approximately the same time, Agents Davies and Robert Albrets arrived on the scene at 1980 Eaton Street.

33.     As the Incident Commander, Defendant Current sent Agents Davies and Albrets to the rear of the home at 1980 Eaton Street.

34.     At this time, Defendant Sergeant Tom Grady, a LPD Sergeant with more experience than Sergeant Current, arrived at Eaton Street, however, Defendant Current remained the "Incident Commander" pursuant to Lakewood PD policy PP-2O64, *Command at Crime Scenes*.

35.     After speaking with residents at 1980 Eaton Street, the LPD officers on scene determined that the window had been previously broken and that the shots likely came from farther south on Eaton Street.

36.     At approximately 2:17, the Denver Police Department's helicopter, *Air One*, which had been in the area since at least 1:55 a.m., began providing illumination in the area from the light mounted on the helicopter.

37.     At 2:18 a.m. Agent Okamura advised Defendant Current by radio communication that he and Agent Mains would proceed south down Eaton, and Defendant Current responded that she would have Agents Smith and Lord also proceed down Eaton on the east side of the street.

38.     At approximately 2:20 a.m., as Defendant Current was walking south down Eaton, Joe Ruiz stepped out the north door of his home at 1940 Eaton St., fired a handgun in the air and re-entered the residence.

39.     Defendant Current and the other LPD officers proceeding south on Eaton saw Mr. Ruiz fire the shots and immediately took cover.

40.     Defendant Current took cover behind a large tree on the north-east corner of the 1940 Eaton St. property, approximately 45 feet from the door from which Mr. Ruiz emerged.

41.     After informing the other LPD officers on scene that she was "pinned down" on the north side of 1940 Eaton, at approximately 2:22 a.m. Defendant Current stated that she had seen who fired the shots and made the following radio transmission:

> *Sgt. Current:  He stepped right out of this red brick single family home that's on the south side of the apartments…I'm right in front of break…party stepped onto the patio it's on the north side of the house and cranked off that round.*
>
> *Agent Okamura:  Sarge, did you see him crank off that round?*

> *Sgt. Current:  Affirm uh, I have a description of the party I saw the muzzle flash.*

42.     At approximately the same time, Agent Albrets made a radio transmission informing Defendant Current that he <u>and</u> Agent Davies "are on the east side of that two story apartment building [at 1960 Eaton Street] just north of the target house and the privacy fence…"

43.     Defendant Current then confirmed Agents Albrets and Davies' location by stating "if you're on the east side of the blonde two-story brick apartments you're just north of the house…so it's going to be the house just south."

### Defendants Current and Grady Meet Up and Call Into the House at 1940 Eaton Street

44.     A few minutes later, Defendant Current strategically moved from her position behind the tree at the north-west corner of the 1940 Eaton property, and joined with Defendant Grady at the front of the apartment building at 1960 Eaton Street.

45.     At 2:30 a.m. Defendant Current ordered that Lakewood Dispatch and all others involved in the on-going incident switch to the Blue Southwest radio channel, which allowed all of the agencies then on scene to communicate through a single radio channel.

46.     Immediately after switching to the Blue Southwest channel, Defendant Grady received the telephone number for 1940 Eaton Street, and just prior to 2:31 a.m. stated in a radio transmission that "I think we're set on our perimeter I'll make a phone call inside."

47.     At 2:32 a.m. Defendant Grady called the number given to him by Lakewood dispatch and made contact with Rebecca Ruiz who was inside the home at 1940 Eaton Street.

***The Suspects Are Cleared from the House and Inform the Officers That There is Not Anyone Else in the House***

48.     At 2:33 a.m. Defendant Current sent a radio transmission stating that Ms. Ruiz "is advising there's three people inside the house."

49.     Defendant Current then sent a radio transmission ordering the other officers on scene to have the three occupants exit the house through the front door in a particular manner.

50.     In response, Defendant Current and Defendant Grady moved to the north side of the apartment building at 1960 Eaton Street.

51.     At 2:35 a.m., Joe Ruiz, Richard Hernandez, and Rebecca Ruiz exited the house at 1940 Eaton Street via the front door and the officers on scene made voice contact with them.

52.     At 2:38 a.m. Agent Lord stated over the radio that he did not see anyone else in the doorway and that the three occupants were then in custody.

53.     Defendant Current then advised over the radio that "we're gonna need to move up and clear the house," that Defendant Grady was "on his way up," and that Agent Okamura should go with him.

54.     Approximately one minute later, Defendant Current advised Denver Police Department's helicopter that "so far as we know we should have everybody out of the house we're just gonna clear it."

55.     In apparent contradiction to this statement, at 2:40 a.m. someone radioed on the Blue Southwest channel that "You've got one more inside."

56.     Immediately following this transmission, Agent Mains advised Agent Okamura to "hold it and stand down," because he had just been advised by one of the three people who exited that there were Pit Bull dogs in the residence.

57.     On information and belief, Agent Mains was also advised by this individual that there was no one else inside the house.

***Sergeant Current Abandons Her Exterior Command Position, Orders Agent Albrets to Assist Inside the House, and Orders Agent Davies to Remain at the North Side***

58.     At approximately 2:41 a.m. Agent Lord radioed that "we need two more up here at the house."

59.     Agent Albrets responded to Agent Lord's transmission, stating "I can come up and take one spot," which he did.

60.     When Agent Albrets entered the house at 1940 Eaton Street, this left Agent Davies alone on the north side of the house, which was contrary to established LPD and national policing standards and protocols regarding the necessity of maintaining a "buddy system" in such situations.

61.     At the same time, Defendant Current also volunteered herself to assist with clearing the house, stating simply on the radio that "I'm out."

62.     In doing so, Defendant Current abandoned her exterior command position and improperly embroiled herself in the hands-on aspects of clearing the house, even though she was the "incident commander."

63. At no time prior to entering the house did Defendant Current take a roll call of agents on location, determine the location of each law enforcement officer or create a visual or even a verbal map of the perimeter locations of officers, all contrary to accepted national and local law enforcement standards and protocols.

64. At this time, there were more than twenty-five (25) law enforcement officers on scene from, *inter alia*, the Lakewood, Denver, and Englewood police departments, and Defendant Current did not order an officer other than herself and Agent Davies' partner to assist in clearing the house.

65. At approximately the same time as Defendant Current volunteered herself to enter the house, Agent Okamura radioed "[b]e advised the basement window that's facing south…I saw a light going on and off as the third person exited the house."

66. Just before 2:44 a.m. Defendant Current asked over the radio "do I still have somebody on the East backside of the house"

67. Agent Davies responded "I'm there and I'm also watching the side door that faces to the North."

68. Defendant Current responded "OK, Just maintain your position."

69. Agent Davies responded "Roger," and remained where Defendant Current had ordered him to stay, watching the north and east sides of the house.

***Agent Braley Responds to a Request for Equipment on the Blue Southwest Channel***

70.     At approximately 2:51 a.m. Defendant Current radioed a request over the Blue Southwest channel asking that someone go back to the LPD station and "grab a catch pole out of the animal control van…."

71.     Defendant Braley responded to Defendant Current's request, stating that he was at the LPD station.

72.     In response to requests by Defendant Current and Agent Okamura, Defendant Braley stated that he could grab whatever they needed from the station and bring it to the scene.

***Defendant Current Again Involves Herself in Non-Command Tasks***

73.     As the LPD officers waited for Defendant Braley to arrive with the animal control materials, Defendant Current left the house at 1940 Eaton Street to retrieve ballistic shields from Defendant Grady's SUV approximately a block away on 20th and Eaton.

74.     At approximately the same time, Defendant Grady requested information about the location of the Pit Bulls from the three individuals who were now in custody in various law enforcement vehicles.

75.     Rebecca Ruiz complied with the officers' requests regarding the location of the Pit Bulls inside the house and was cooperative.

76.     Rebecca Ruiz specifically told officers that there was no one else in the house, and Defendant Current was aware of this statement.

77.     Mr. Ruiz and Mr. Hernandez also confirmed that there was no one else inside the house, but that there were three pit bulls.

### *Sergeant Current Orders the Denver Police Department's Helicopter to Leave the Scene, Even Though it Has Lights and Infrared Capabilities*

78.     The Denver Police Department owns and operates a helicopter (*Air One*) equipped with a Forward Looking Infrared Radar (FLIR) camera with downlink video capability and digital cameras.

79.     Police detectives who are knowledgeable in criminal apprehension fly the Denver police department's helicopter.

80.     As discussed above, *Air One* provided on-scene air support coverage at 1940 Eaton Street on November 9, 2012.

81.     *Air One* used its spotlight to assist the officers on scene initially, and then once it was determined that the occupants would be coming out of the house, doused its spotlight.

82.     *Air One* took FLIR video for 18 min 55 seconds of the scene prior to the shooting as well as returning after the incident.

83.     At 3:07 a.m. the pilot of DPD's *Air One* asked Sgt. Current "do you need anything before we take off?"

84.     Defendant Current immediately responded "No, I think we're good," allowing *Air One* to leave the scene approximately 30 minutes <u>before</u> Defendant Braley shot and killed Agent Davies.

85.     Defendant Current dismissed *Air One* despite its demonstrated ability to locate perimeter locations and any suspects that may be outside of the residence.

### Defendant Current Again Confirms Agent Davies' Position, as Does Agent Albrets

86.     After radioing "we have the front room of the home secured," Defendant Current again confirmed Agent Davies' location.

87.     Just before 3:09 a.m. the following exchange occurred between Defendant Current and Agent Davies over the Blue Southwest channel:

> Sgt. Current:  And 3N30 to N53, are you actually in the backyard…or are you on the outside of the fence?
>
> Agent Davies:  N33 I'm on the outside of the fence ah kinda peeking over it's not a great spot but (inaudible)…backyard…
>
> Sgt. Current:  Okay, so the backyard's secure, I mean will we be able to throw the dogs back there…
>
> Agent Davies:  Stand by…as far as I can see it does appear to be secure…
>
> Sgt. Current:  Okay…

88.     At 3:09 a.m. Agent Albrets radioed a warning to Agent Davies that he was going to open the north door to the residence, stating, "Davies I'm gonna open the side door…"

89.     Agent Davies responded affirmatively, stating "roger."

### Joe Ruiz Remains on the Scene

90.     At 3:11 a.m. Agent Mains informed LPD dispatch that Joe Ruiz had been removed from the immediate area of 1940 Eaton Street in an Edgewater Police Department vehicle.

91.     However, Mr. Ruiz remained within a one block radius of the scene, inside the Edgewater Police department vehicle until approximately 4:15 a.m., when a Jefferson County Sheriff's Department Deputy took him to the LPD station.

92.     At no point did Defendant Current attempt to confirm that the man who she "has a description of" at 2:22 a.m., when the shots were fired, was Mr. Ruiz, even though he was on scene throughout the incident.

### Defendant Braley Arrives on Scene and the LPD Officers Attempt to Contain the Pit Bulls

93.     At approximately 3:15 a.m., through communications with Defendant Current, Defendant Braley realized he had gone to the wrong street, and at approximately 3:18 a.m. Defendant Braley arrived at the 1940 Eaton Street house.

94.     Over the next seventeen (17) minutes, Defendant Current, who was inside the house assisting Defendant Grady and Agents Okamura, Albrets, and Lord, radioed two transmissions, one about the efforts to contain the dogs and one about moving the arrested occupants away from the scene.

95.     At no point during this time period did Defendant Current or Defendant Grady hold a briefing in order to familiarize Defendant Braley with the incident and the location of the perimeter officers.

96.     Then, at 3:35 a.m. Defendant Current radioed the following transmission to dispatch:

*Sgt. Current:  Lakewood N30 dispatch…*

*Dispatch:  N30…*

> *Sgt. Current:  There's an extremely angry dog in one of the bedrooms…we'll be clearing the rooms from the exterior through the window…FYI to the other units on scene…*

97.   This was the <u>only</u> message communicated over the radio indicating that there might be some activity on the exterior of the house.  No warning was given that a heavily armed, three member LPD SWAT Team was going to be exiting the house, what door was going to be used, or that the three armed agents were unaware the backyard had been cleared.  Agent Davies, or for that matter, the remainder of the over twenty five law enforcement officers on the exterior of the house, had no warning that an armed assault was about to begin.

98.   Then, at 3:40 a.m., Defendant Current aired the transmission "shots fired."

### Throughout the Incident Defendant Current Fails to Act as an Effective Incident Commander

99.   At no time during the presence of the LPD at 1940 Eaton Street, was there an explicitly identified incident commander or incident command structure.

100.   While Defendant Current was the proper and purported incident commander, and was responsible for the overall control and coordination of the operation, she repeatedly defaulted to the role of a subordinate instead of a commander.

101.   Defendant Current's acts and omissions were in violation of national policing standards and exhibited deliberate indifference to the known risk that poor supervision would result in the injury or death of a law enforcement agent.

### Defendant Current Failed to Utilize DPD's Air One

102.    The pilot or crew of *Air One* could have easily identified perimeter officer locations as well as gaps in coverage had Defendant Current asked.

103.    *Air One* was dispatched by the Denver Police Department and was on-scene at 1940 Eaton Street using both a spotlight and a FLIR.

104.    On information and belief, from the viewpoint of *Air One*, it was apparent that the "three" side (rear) of the house at 1940 Eaton Street was not contained.

105.    Using the air asset to assist and direct containment operations would have identified flaws in the containment and situational awareness for Defendant Current.

106.    Defendant Current's decision to call off *Air One* caused a deficiency in situational awareness and coordination of effort for the ground units and incident command.

107.    The low light conditions, coupled with lack of air support and ineffective command and control, placed the involved personnel, including Agent Davies, at a distinct and known disadvantage in handling the operation at 1940 Eaton Street.

108.     The low light conditions, coupled with lack of air support and ineffective command and control, created a known increased risk of harm or death for the involved personnel, including Agent Davies.

109.    Defendant Current never made an attempt to have *Air One* identify perimeter officer locations, despite her apparent confusion as to the location of these officers.

110.    At 2:45 a.m. an unknown officer asked *Air One* to "keep an eye on the backyard," but *Air One* had already left the scene pursuant to Defendant Current's instructions.

### *Defendant Current Failed to Brief Defendant Braley*

111.    As "Incident Commander," it was Defendant Current's duty to brief Defendant Braley on his arrival at the scene, and before allowing him to become involved in any law enforcement action.

112.    When Defendant Braley arrived on scene he was not properly briefed by any LPD employee, including Defendant Current.

113.    Before Defendant Braley engaged in the action to clear the house he was not properly briefed by any LPD employee, including Defendant Current.

114.    Defendant Current's failure to brief Defendant Braley resulted in Defendant Braley's lack of necessary situational awareness.

115.    Had Defendant Current properly briefed Defendant Braley, he would have known where Agent Davies was located and that the backyard was clear.

### *Defendant Current Failed to Confer With Agent Albrets Regarding Agent Davies' Location*

116.    At no time did Defendant Current or any other LPD employee ask Agent Albrets where Agent Davies was located, even though he had previously been posted with Agent Davies in the perimeter.

117.   At no time did Defendant Current or any other LPD employee ask Agent Albrets about the location of perimeter personnel.

118.   Had Defendant Current conferred with Agent Albrets, he would have reconfirmed knowledge she already possessed, *i.e.* that Agent Davies was north of the fence on the north side of the house.

### Defendant Current Failed to Establish a Perimeter

119.   Defendant Current had a duty to establish an inner scene perimeter at the 1940 Eaton Street residence.

120.   At no point did Defendant Current properly establish a perimeter around the residence at 1940 Eaton Street.

121.   Defendant Current was aware that there were several officers in a loose perimeter around the residence, including Agent Davies, but failed to confirm their location and the effectiveness of the perimeter.

122.   After Mr. Ruiz fired his last shot, and while Defendant Grady was making preparations to call inside the residence, Defendant Current should have been establishing a perimeter and documenting the whereabouts of the officers from all jurisdictions.

123.   Defendant Grady improperly made the telephone call into the residence before a perimeter was established.

### Defendants Current and Grady Failed to Properly Brief the Entry Team

124.   The entry team, consisting of Defendant Braley, Defendant Grady, and Agent Okamura, was never appropriately briefed regarding (a) the plan to clear the

house from the exterior, (b) the location and presence of perimeter officers, and (c) the actual status of any outstanding suspect.

125.    There was poor communication among the members of the entry team regarding the plan to exit the house.

126.    In fact, there was no communication among any of the officers in the house at 1940 Eaton Street, including by or amongst Defendants Current and Grady, regarding the location of perimeter personnel.

127.    When Defendant Grady was subsequently asked if, prior to exiting to the backyard, he had any knowledge of who was outside and in what positions, or if there was any radio traffic regarding what personnel were in what positions outside, he said, "No," and added, "I have no idea" regarding any of the perimeter locations being aired.

### *There Were No Extenuating Time Constraints*

128.    The nature of the incident at 1940 Eaton on November 9, 2012, was not time competitive or emergent.

129.    Consequently, Defendant Current, as Incident Commander, had sufficient time to engage in a proper command and supervision strategy, had she chosen to do so.

### *Defendant Current Did Not Properly Utilize Personnel Available to Her*

130.    There were more than twenty-five (25) law enforcement officers on the scene at 1940 Eaton Street on November 9, 2012, from several separate police departments and a sheriff's office.

131.   Defendant Current was able to communicate with all of the law enforcement officers on scene through the Blue Southwest radio channel.

132.   Despite the availability of more than twenty-five (25) law enforcement officers on the scene, Defendant Current failed to establish a perimeter of containment around the house at 1940 Eaton Street and, further, allowed the improper ad hoc perimeter to be under-staffed, resulting in coverage gaps.

133.   Moreover, despite the availability of more than twenty-five (25) law enforcement officers on the scene, Defendant Current failed to use a buddy system for the officers in the perimeter, including Agent Davies.

134.   Given the availability of more than twenty-five (25) law enforcement officers on the scene, Defendant Current should have either requested that an officer other than Albrets assist inside the residence or assigned an officer to replace Agent Albrets when he left Agent Davies.

135.   During a subsequent interview, Defendant Current stated, "I didn't actually check to make sure that somebody else was with Davies."

136.   Had Defendant Current assigned a different officer to assist in the house or assigned an officer to replace Albrets as Agent Davies' partner, Agent Davies would have had an additional person with him to communicate their position, watch for suspects, and communicate with the entry team as they exited.

137.   In sum, the enforcement operation at 1940 Eaton Street lacked sufficient command and control to be executed safely and effectively, because Defendant Current did not adequately supervise the scene.

138.    Defendant Current's failure to adequately supervise the scene violated national standards and LPD policies regarding, *inter alia*, incident command, perimeter establishment, officer briefing, and SWAT dispatch protocols.

139.    The inevitable consequences of Defendant Current and Defendant Grady's leadership failure was that no one was in effective overall command of the incident, and the application of policy, proper coordination, communications, and officer safety concerns were compromised.

140.    It is known among all law enforcement personnel, including Defendants, that ineffective command and supervision of a scene creates an unreasonable risk of an officer injury or fatality.

141.    Consequently, the actions and omissions of Defendants Current and Grady created a known unreasonable risk of officer fatality, which Defendants Current and Grady were deliberately indifferent to and that directly resulted in the shooting death of Agent Davies.

***Defendants Current and Grady Failed to Follow LPD Policy and National Standards Regarding Deployment of SWAT in Barricaded Suspect Situations***

142.    Defendant Current and Defendant Grady failed to follow LPD policies and national standards regarding SWAT deployment.

143.    If Defendants Current and Grady believed that there was still an outstanding suspect inside the house at 1940 Eaton Street, the situation was that of a barricaded suspect.

144.   It is a national police standard that SWAT should be called in incidents involving barricaded suspects.

145.   Defendants Current and Grady made the purposeful decision not to call SWAT to 1940 Eaton Street, in contravention of clear standards to the contrary.

146.   Defendants Current and Grady violated national police practices standards by not calling SWAT to the scene at 1940 Eaton Street on November 9, 2012.

147.   Had Defendant Current or Grady called in SWAT, the response would have required more effective operational control of the situation including awareness of containment personnel locations.

### Neither Defendant Current nor Defendant Grady Established a Command Post to Coordinate the Scene at 1940 Eaton Street

148.   It is a national police practices standard that in circumstances such as those that existed at 1940 Eaton Street on November 9, 2012, the incident commander establish a "Command Post."

149.   A Command Post is a centralized location from which the incident commander can supervise the scene and coordinate officer movements.

150.   Neither Defendant Current nor Defendant Grady established a Command Post at the scene of 1940 Eaton Street.

151.   A Command Post was a basic necessity for effective command and control of the situation at 1940 Eaton Street.

152.    The establishment of a Command Post was not accomplished in part due to command personnel, including Defendant Current and Defendant Grady, performing subordinate duties.

153.    It is a national police practices standard that a Command Post should include, *inter alia*, a diagram of the scene that details the locations of perimeter personnel.

154.    Defendant Current did not document the perimeter around the residence at 1940 Eaton Street and the positions of the officers.

155.    Defendant Current should have documented the perimeter and officer locations.

156.    Had Defendant Current documented the perimeter and officer locations, she would have been able to brief the entry team, including defendants Braley and Grady, on Agent Davies' location behind the fence on the north side of the house.

157.    It is a national police practices standard that the locations of perimeter personal are to be recorded and communicated using a perimeter quadrant naming protocol that assigns numbers to the front, back, and sides of the residence or scene.

158.    This quadrant naming protocol is used in order to eliminate confusion regarding the location of perimeter personnel, as the use of cardinal directions may become confusing and lead to gaps in the perimeter or lack of knowledge regarding perimeter personnel locations.

159.    An established LPD practice was to use cardinal directions, such as north, east, west, and south, to describe perimeter personnel location, and Defendants Current and Grady continued this outdated and substandard practice on November 9, 2012, by not using the national standard quadrant naming protocols.

160.    Agents Lord, Mains, and Albrets all stated in the subsequent investigation that they each knew that Agent Davies was on the north side of the fence and house.

161.    The other LPD officers inside the house at 1940 Eaton Street did not know Agent Davies' location: (a) Defendant Current, the Incident Commander; (b) Defendant Grady, the entry team commander; (c) Agent Okamura, a member of the entry team; and (d) Defendant Braley, the officer that shot and killed Agent Davies.

162.    These four officers' lack of knowledge regarding Agent Davies' location was directly caused by the deliberately indifferent acts of Defendants, including, but not limited to, Defendant Current and Grady's wilful failure to properly supervise and command the scene at 1940 Eaton Street.

163.    As a result of Defendants' wilful failures to properly command and supervise the incident, the scene at 1940 Eaton Street was described by involved law enforcement officers in the subsequent investigation as "Chaotic" and a "Cluster Fuck."

*Ineffective and Inaccurate Communications Among the Agents Inside the House Results in Confusion*

164.     Once Defendant Braley arrived on the scene at 1940 Eaton Street with the catch poles, the officers involved attempted to create a plan to clear the house.

165.     Over the next approximately 30-40 minutes there were seven (7) LPD officers inside the house engaging in various activities.  At no time were any of these officers confronted by any direct threat.

166.     Initially, Defendant Grady, Defendant Braley, and Agent Okamura decided to try to catch the dogs by opening the interior doors of the house.

167.     The first time they tried to open one of the interior doors they heard intense growling, which indicated to them that the dog inside was aggressive, so they abandoned their original plan.

168.     Then, Defendant Current, Defendant Grady, Defendant Braley, and Agent Okamura began discussing other ways to clear the interior of the house.

169.     At no time during the conversations inside the house did anyone suggest that the exterior of the house needed to be cleared.

170.     Finally, Defendant Current, Defendant Grady, Defendant Braley, and Agent Okamura agreed that an entry team would clear the house from the outside, by breaking the windows to each room and scanning the room with a mirror to determine what was inside.

171.     There was confusion amongst those involved about how the plan would be executed.

172.     Defendant Braley went to the front, west door of the house and removed the porch light.

173.   Agent Okamura created a door jamb to keep the front door open.

174.   Only after these steps were taken did Defendant Grady tell Defendant Braley and Agent Okamura that they would have to go out through the north door in the kitchen of the residence in order to reach the garage.

175.   Other officers reported that they thought the entry team was going to come out through the front door and move around the house from there.

176.   At no point did Defendant Current order additional officers to assist the entry team.

177.   At no point did anyone in the house indicate to officers on the scene that there was any threat other than the dogs.  There was no announcement to officers on the scene of a suspicion of a possible fourth suspect <u>inside or outside</u> the house.

### *Current's Decision to Merely Append the Casual Announcement of the Grady Team's Entry to a Radio Call to Dispatch was Confusing*

178.   Not only was the internal communication amongst the officers in the house confusing, but Defendant Current's failure to clearly communicate to all the decision to have a team of LPD agents exit the house to the north placed all perimeter officers at a substantial known risk.

179.   It is a national standard of incident command that the tactical decisions and movements of entry teams be communicated to the officers in the perimeter in order to avoid having perimeter officers mistaken for a suspect once the team begins moving.

180.   If such communications do not occur, it is known that an increased risk of officer injury or death results.

181.   Defendant Current's unclear and inadequate advisement to the over twenty-five (25) other law enforcement officers on scene regarding the team exiting the house was communicated as an "FYI" tagged onto a message to dispatch.

182.   Defendant Current's  communication regarding the team exiting the house was inappropriate and exhibited an indifference for the known risks to officers in the perimeter because:

a.   No tactical information was conveyed to perimeter personnel who were in need of further information;

b.   No information was conveyed about the timing of the action, *e.g.* "the entry team will exit out the north door in thirty seconds";

c.   No information was conveyed as to which door would be used to exit the residence;[1]

d.   No information was conveyed regarding who was exiting, how many, and in what formation;

e.   No information was conveyed regarding which direction the team would proceed around the exterior of the house;

f.   No information was conveyed regarding the full objectives of the entry team;

g.   No information was conveyed regarding Defendants' apparent belief that the backyard has not been cleared;[2] and

h.   No information was conveyed that the entry team would be "clearing" the backyard prior to clearing the house.

183.   There was absolutely no communication with perimeter personnel to confirm the plan to clear the house from the exterior or to determine the positions of perimeter officers.

---

[1] In fact, as described above even Defendant Braley and Officer Okamura initially believed they were exiting through the front door.
[2] As noted above, Officer Davies had already aired a report over the radio in response to Defendant Current that the backyard was in fact clear and secured.

184.    In response to a subsequent question about whether there was any radio traffic regarding the plan to clear the backyard, Defendant Grady replied, "No, no radio traffic whatsoever that we're going to clear the backyard."

***Defendant Braley Shoots and Kills Agent Davies***

185.    Once Defendants Current and Grady determined that the entry team would exit the north door of the residence at 1940 Eaton Street and "clear" the house from the exterior, Defendant Braley, Defendant Grady, and Agent Okamura prepared themselves to exit.

186.    Defendant Braley was the first of the three officers to reach the north door, followed by Defendant Grady and Agent Okamura.

187.    As Defendant Braley stepped out of the north door at the 1940 Eaton Street residence he had his AR-15 rifle raised, with a bullet in the chamber and the safety off.

188.    Defendant Braley stepped into a carport, turned to his left, moved around a vehicle parked in the carport, and proceeded to the west to move beyond a tarp that covered the north opening of the carport in order to observe and clear the deep left corner of the area to the immediate north of the house, but within the fenced area, and briefly illuminated his rifle mounted bright flashlight to make the area visible.

189.    Defendant Braley then took a few steps to his left in order to allow Defendant Grady and Agent Okamura to exit through the door as well.

190.    Defendant Braley began to visually scan from his left to right along the fence to the north of the residence.

191.    As Defendant Braley scanned along the fence he heard a voice he believed was addressing him from his right say in a conversational tone "hey."

192.    Defendant Braley believed the person who stated "hey" was trying to get his attention.

193.    When Defendant Braley heard the voice he turned toward where it originated from and illuminated his bright rifle mounted flashlight.

194.    At this point, Defendant Braley saw what he believed to be a bald Hispanic male peeking over the privacy fence to the north of the residence.

195.    Defendant Braley was able to see the individual's left hand, right hand, and most of the person's face.

196.    Defendant Braley saw a black semi-automatic pistol in the individual's right hand.

197.    On information and belief, Agent Davies also had a flashlight in his left hand.

198.    Defendant Braley immediately yelled words to the effect; "Police, Drop the Gun, Drop the Gun."

199.    Approximately 1.5 seconds after Defendant Braley yelled these commands, Defendant Braley fired six (6) shots at the individual behind the fence.

200.    The individual Defendant Braley saw behind the fence was Agent Davies.

201.    One of Defendant Braley's shots struck Agent Davies just below his left eye, killing him.

202.    Another bullet went through the privacy fence approximately three feet from the top.

203.    The remaining four (4) shots all struck the apartment building behind Agent Davies in progressively higher locations.

### Defendant Braley Should Have Been Aware of Agent Davies' Location and Should Have Announced the Entry Team

204.    Defendant Braley was listening to the Blue Southwest channel both at the LPD station and throughout the early morning of November 9th.

205.     Defendant Braley became directly involved in the incident at 1940 Eaton Street when he volunteered to bring equipment to the scene.  He then began listening to radio traffic over his radio earpiece.

206.    On multiple occasions during the period that Defendant Braley was listening to the radio traffic, both before and after the switch to Blue Southwest, Agent Davies made it known that he was on scene and that he was located on the north-east corner of the house hanging onto the fence.

207.    Defendant Braley heard or should have heard these radio communications from Agent Davies.

208.    Defendant Braley was an experienced SWAT officer and had recently applied for a sergeant position at the LPD, prior to November 9, 2012.

209.    As a Sergeant candidate, Defendant Braley knew or should have known the LPD's policies and the national standards regarding, *inter alia*,

perimeter containment, officer communications, briefings, command posts, and communication of actions.

210.    As such an experienced officer, Defendant Braley should have known that it is a national policing standard that every officer shall gather the information necessary for them to safely do their job.

211.    As an experienced officer, Defendant Braley knew or should have known that LPD and national law enforcement procedures dictate that a perimeter should be established in circumstances similar to what he faced on November 9, 2012.

212.    Consequently, Defendant Braley acted improperly when he failed to request information regarding the location of perimeter personnel from Defendants Current and Grady as well as the other officers in the house.

213.    It is also a national police practices standard that police officers announce their actions before they take them in circumstances such as those present at 1940 Eaton Street on November 9, 2012.

214.    Defendant Braley did not announce that he was exiting the house through the north door when he did so.

### Defendant Braley's Use of Deadly Force to Kill Agent Davies was NOT Objectively Reasonable Under the Circumstances

215.    Notwithstanding the fact that Defendant Braley's lack of information regarding Agent Davies' position was objectively unreasonable, Defendant Braley's use of deadly force against Agent Davies was in itself objectively unreasonable.

216.    Defendant Braley was paying attention to radio calls aired on the Blue Southwest channel and was able to remember specific calls by Defendant Current and Agent Mains.

217.    Agent Davies' position was confirmed at least four separate times by transmissions on the Blue Southwest channel, by both Agent Davies and Agent Albrets.

218.    Defendant Braley should have known that Agent Davies was located behind the fence on the north of the house.

219.    Given the multiple radio transmissions regarding Agent Davies' location, it was unreasonable for Defendant Braley to believe that Agent Davies was anything other than an LPD officer.

220.    Defendant Braley was a sergeant candidate and experienced officer, and should have known that a perimeter was required to be established in similar circumstances.

221.    Because a perimeter was required to be established, it was unreasonable for Defendant Braley to believe that Agent Davies was anything other than a law enforcement officer.

222.    At no point was there any indication to Defendant Braley from radio transmissions or in discussions with the other officers in the residence that there was an outstanding suspect underline_outside of the house.

223.    Consequently, as there was no indication that there was an outstanding suspect outside the house, it was unreasonable for Defendant Braley to believe that Agent Davies was anything other than a law enforcement officer.

224.    Defendant Braley acknowledges that Agent Davies said 'hey" in a conversational tone in order to get Defendant Braley's attention.

225.    It is illogical to believe that an armed criminal who had escaped from the house would calmly try to alert a SWAT officer to his position by saying "hey."

226.    Because it is unreasonable to believe an outstanding suspect would calmly alert a police officer to his position, it was unreasonable for Defendant Braley to believe that Agent Davies was a threat.

227.    On the night of November 9, 2012, Agent Davies was wearing an LPD police jacket with reflective patches on both shoulders.

228.    On information and belief, these patches were visible to Defendant Braley.

229.    It was unreasonable for Defendant Braley to believe that Agent Davies was anything other than an LPD officer.

230.    On information and belief, Agent Davies held a flashlight in his left hand, which indicated that he was likely a police officer, and therefore it was unreasonable for Defendant Braley to believe that Agent Davies was anything other than a police officer.

231.    Defendant Braley shot Agent Davies less than two seconds after telling him to drop his gun, while blinding him with a bright flashlight.

232.   It was unreasonable for Defendant Braley to give Agent Davies that short of period of time to drop his weapon and/or identify himself as an LPD officer.

***Defendant Braley Had Previously Shot and Killed a Hispanic Suspect and was Returned to the Streets Without Sufficient Precautions***

233.   Approximately two years prior to shooting and killing Agent Davies, Defendant Braley, while on duty as an LPD Agent, shot and killed a fleeing suspect who pointed a loaded handgun at him.

234.   The fleeing suspect was named Eugene Paul Velarde and was of Hispanic descent.

235.   On information and belief, the LPD did not provide Defendant Braley sufficient mental health treatment before returning him to the streets as a SWAT officer.

236.   On information and belief, the LPD did not conduct a sufficient fitness for duty evaluation of Defendant Braley before returning him to the streets as a SWAT officer.

237.   In addition to Defendant Braley's involvement in this shooting, he had previously been involved in other extremely dangerous and traumatic events while working as a law enforcement officer at the LPD.

238.   On December 2, 2010, Defendant Braley was one of several LPD agents who shot and killed a robbery suspect after a lengthy car chase.

239.   On information and belief, the LPD did not provide sufficient mental health care, fitness for duty evaluation, or psychological analysis before it returned Defendant Braley to the streets after these traumatic events.

240.   It was a substantial known risk that Defendant Braley would encounter other stressful and threatening situations once he was returned to the street after these events.

241.   It was a known risk that if Defendant Braley was not properly treated and/or evaluated he would respond with deadly force to an incident that did not require such force.

### Agent Davies and His Family Pay the Highest Price for the Defendants' Wrongful Actions

242.   When he was shot and killed by Defendant Braley, Agent James Davies had been married to Plaintiff Tamara Davies for thirteen (13) years.

243.   Agent Davies and Mrs. Davies have two children:  Chloe, who was six-years-old when her father was killed, and Ethan, who was two-years-old when his father was killed.

244.   As a result of the death of Agent Davies, he, Agent Davies, was deprived of the affection of, society of, companionship of, ability to engage in household services for, ability to aid, and ability to comfort his family, including, *inter alia*, Plaintiffs Tamara, Ethan, and Chloe.

245.   As a result of his untimely death, Agent Davies was also deprived of the ability to continue earning income.

246.   At the time of his death, Agent Davies was 35-years-old and had a promising career as a police officer ahead of him.

247.   Had Agent Davies not been killed on November 9, 2012, he would have continued working as a police officer at the LPD or elsewhere and would have been consistently promoted throughout his career.

248.   As a result of his death, Agent Davies suffered other severe economic and noneconomic losses and injuries.

## FIRST CAUSE OF ACTION
**(Violation of Constitutional Rights,
Liability Under 42 U.S.C. § 1983 – Against Agent Devaney Braley, in his
Official and Individual Capacities)**

249.   Plaintiff restates and incorporates paragraphs 1 through 248 as though fully set forth.

250.   Defendant Braley, in his official and individual capacity, acting under color of law, subjected Agent Davies to a deprivation of his rights, privileges and immunities secured by the laws and Constitution of the United States of America.

251.   Pursuant to the Fourth Amendment and Fourteenth Amendment to the United States Constitution, Agent Davies had a right to be free from the unreasonable use of deadly force at the hands of LPD employees.

252.   Defendant Braley's use of deadly force against Agent Davies, a uniformed police officer providing perimeter containment pursuant to the incident commander's orders, was not objectively reasonable in light of the facts and circumstances encountered by Defendant Braley in the early morning hours of November 9, 2012.

253.    Under the totality of the circumstances encountered by Defendant Braley on November 9, 2012, his use of deadly force against Agent Davies was not justified and was objectively unreasonable.

254.    A reasonable officer in Defendant Braley's position would <u>not</u> have had probable cause to believe that there was a threat of serious physical harm to themselves or to others posed by Agent Davies, a uniformed police officer providing perimeter containment pursuant to the incident commander's orders.

255.    Both prior to and at the precise moment Defendant Braley's shot and killed Agent Davies, no law enforcement officer was in danger from a threat from the exterior of the house.

256.    Defendant Braley set in motion a series of events that Defendant Braley knew or reasonably should have known would cause others to deprive an LPD employee, including Agent Davies, of his or her rights secured by the U.S. Constitution and its Amendments.

257.    Defendant Braley personally participated in the decisions and actions that subjected Agent Davies to, and caused Agent Davies to be subjected to, a deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

258.    Defendant Braley, through his own individual actions, violated the Constitution.

259.   Defendant Braley's acts and omissions include, but are not limited to those described at paragraphs 185-232, and these paragraphs are specifically incorporated herein

260.   Defendant Braley acted with deliberate indifference, objectively unreasonably, heedlessly, and recklessly, without regard for the rights of LPD employees, including Agent Davies.

261.   Defendant Braley's acts and omissions directly caused, proximately caused, and were the moving force behind the deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

262.   If a need to use deadly force existed, such need was unreasonably created by Defendant Braley's own deliberate and reckless conduct.

263.   As a direct and proximate result of the violation of Agent Davies' right to be free from the unreasonable use of deadly force, Agent Davies suffered injuries and damages, both economic and noneconomic, in an amount to be determined at trial.

264.   As relief for the injuries caused by Defendant's conduct, Plaintiff, in her capacity as personal representative for the Estate of James Davies, seeks an award of compensatory damages in an amount that includes, but is not limited to, medical and burial expenses; pain and suffering before death; loss of earnings based upon the probable duration of the James Davies' life had not the injury occurred; James Davies' loss of consortium; other damages recognized in common law tort

actions; prejudgment and post-judgment interest; costs of litigation; attorneys' fees; and such other and further relief as the Court deems just and proper.

## SECOND CAUSE OF ACTION
### (Violation of Constitutional Rights,
### Municipal Liability Under 42 U.S.C. § 1983 – Against the City of Lakewood)

265.   Plaintiff restates and incorporates paragraphs 1 through 264 as though fully set forth.

266.   The City/LPD, acting under color of state law, and according to its policies and/or customs, including through its final policy-makers, acted in a manner that deprived Agent Davies of his rights secured by the laws and Constitution of the United States of America.

267.   Pursuant to the Fourth Amendment and Fourteenth Amendment to the United States Constitution, Agent Davies had a right to be free from the unreasonable use of deadly force at the hands of LPD employees.

268.   The LPD violated Agent Davies' right to be free from the unreasonable use of deadly force, or caused Agent Davies' right to be violated.

269.   The violation of Agent Davies' constitutional rights was occasioned by, and directly and proximately caused by, the existence of well settled policies and/or customs on behalf of the LPD.

270.   Defendant LPD, as a matter of policy, custom and/or practice, engaged in conduct that was a moving force behind and directly and proximately caused the violation of Agent Davies' rights, including, *inter alia*, the following conduct:

      a.    Failing to properly screen and qualify applicants for the positions of agent and sergeant;

b. Failing to properly train LPD Sergeants regarding proper incident command, including, but not limited to, inadequate training regarding identification of an incident commander, inadequate training regarding the establishment of command posts, inadequate training regarding the establishment of perimeters, inadequate training regarding response to shots fired reports;

c. Failing to properly train officers, including Defendant Braley, in circumstances similar to what occurred on November 9, 2012;

d. Enforcing a policy and/or custom that resulted in LPD Sergeants with the least experience being assigned to the more active and dangerous "graveyard" shifts without proper supervision or training;

e. Despite having knowledge of continuing problems with its radios and communications over the radio system and knowing that these problems created significant dangers for LPD officers, the LPD chose not to address these problems and instead sent its officers into the field with defective radio equipment;

f. Implementing a policy and/or custom of returning officers to active duty after traumatic incidents and/or after incidents in which the officer killed someone, without properly verifying the officer's fitness for duty and without providing sufficient mental health counseling and evaluation;

g. Failure to implement a standard operating procedures regarding the establishment of inner and outer perimeters at incident scenes;

h. Failure to implement a standard operating procedures regarding staffing and the hours worked by its officers;

i. Allowing and encouraging a "cowboy" mentality to exist in the Department where unnecessary risks were consistently taken by law enforcement officers which knowingly put LPD agents in danger of injury and death;

j. Allowing conduct that rewarded, encouraged, and acquiesced in risky behavior or not tactically safe behavior by agents and sergeants;

k. Failure to provide sufficient supervision and training of officers' in the use of personal weapons;

l. Insufficiently regulating the use of and verifying that agents could properly operate personal weapons and equipment;

m. Utilizing long shifts and a substantial amount of overtime to accomplish law enforcement coverage and other needs, when it knew that such a policy resulted in significant increased risk of injury or death to LPD employees;

n.   Failure to implement policy regarding use of the SWAT that established when SWAT was to be called to an incident and allowing ambiguous policies to exist;

o.   Failing to properly train agents regarding the use of deadly force in low-light high stress circumstances;

p.   Allowing a custom to be practiced that discouraged the use of Department resources, such as SWAT and Denver's *Air One*, and resulted in an inherently dangerous case of "policing on a shoestring";

q.   Following a practice that discourages the use of law enforcement resources that cost the LPD money, such as the call out of SWAT;

r.   Implementing or allowing a practice that discouraged the notification of Commanders and Lieutenants in situations that required elevated supervision; and

s.   Allowing a policy and practice of having no supervisory officers on duty during certain shifts.

271.   The LPD maintained such policies, procedures, and/or customs despite the known substantial risk that such policies, procedures, and/or customs placed LPD's own officers in unreasonable danger of severe injury or death.

272.   The LPD acted in a deliberately indifferent manner towards the known risk that its policies and/or customs would eventually result in serious injuries to or the death of LPD officers, including Agent Davies.

273.   The LPD's final decision-makers, including but not limited to Defendant Kevin Paletta, acquiesced in, created, maintained, and/or implemented policies, procedures, and/or customs that directly and proximately caused the violation of Agent Davies' rights.

274.   The acts, omissions, customs, procedures, and policies of the LPD, as described herein, were the direct and proximate cause of, and moving force behind,

the violation of Agent Davies' right to be free from the unreasonable use of deadly force.

275.    The acts, omissions, customs, procedures, and policies of the LPD, as described herein, created the opportunity and circumstances that led to Defendant Braley's use of deadly force against Agent Davies, as well as any need for such use of force.

276.    As a direct and proximate result of the violation of Agent Davies' right to be free from the unreasonable use of deadly force, Agent Davies suffered injuries and damages, both economic and noneconomic, in an amount to be determined at trial.

277.    As relief for the injuries caused by Defendant's conduct, Plaintiff, in her capacity as personal representative for the Estate of James Davies, seeks an award of compensatory damages in an amount that includes, but is not limited to, medical and burial expenses; pain and suffering before death; loss of earnings based on the probable duration of the James Davies' life had not the injury occurred; James Davies' loss of consortium with his wife and children; other damages recognized in common law tort actions; prejudgment and post-judgment interest; costs of litigation; attorneys' fees; and such other and further relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**(Violation of Constitutional Rights,**
**Liability Under 42 U.S.C. § 1983 – Against Police Chief Kevin Paletta,**
**in his Official and Individual Capacities)**

278.   Plaintiff restates and incorporates paragraphs 1 through 277 as though fully set forth.

279.   Defendant Paletta, in his official capacity as Chief of Police of the LPD and in his individual capacity, acting under color of law, caused Agent Davies to be subjected to a deprivation of his rights, privileges and immunities secured by the Constitution of the United States of America and its Amendments.

280.   Pursuant to the Fourth Amendment and Fourteenth Amendment to the United States Constitution, Agent Davies had a right to be free from the unreasonable use of deadly force at the hands of LPD employees.

281.   Defendant Paletta created, promulgated, implemented, and/or was responsible for the continued operation of policies and/or customs, the enforcement of which by Defendant Paletta and/or Defendant Paletta's subordinates subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

282.   The policies and/or customs that Defendant Paletta created, promulgated, implemented, and/or was responsible for the continued operation of, created the opportunity and circumstances for Defendant Braley to use deadly force against Agent Davies.

283.   Defendant Paletta acted in a deliberately indifferent and objectively unreasonable manner through his acts and omissions that created, promulgated, implemented, continued his and others operation under, and failed to remedy the policies and/or customs that subjected Agent Davies to, or caused Agent Davies to

be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

284.   An affirmative link exists between the acts and omissions of Defendant Paletta's subordinates that subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments, and Defendant Paletta's adoption of a plan, policy, and/or custom, express or otherwise, showing Defendant Paletta's authorization or approval of such acts and omissions.

285.   Defendant Paletta set in motion a series of events that Defendant Paletta knew or reasonably should have known would cause others to deprive an LPD employee, including Agent Davies, of his rights secured by the U.S. Constitution and its Amendments.

286.   Upon information and belief, Defendant Paletta was a policy-making official of the LPD both before and after the death of Agent Davies.

287.   Defendant Paletta acted with deliberate indifference, objectively unreasonably, heedlessly, and recklessly, without regard for the rights of LPD employees, including Agent Davies.

288.   Defendant Paletta's acts and omissions proximately caused and were the moving force behind the deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

289.   Defendant Paletta, through his own individual actions, violated the United States Constitution.

290.    As a direct and proximate result of the violation of Agent Davies' right to be free from the unreasonable use of deadly force, Agent Davies suffered injuries and damages, both economic and noneconomic, in an amount to be determined at trial.

291.    As relief for the injuries caused by Defendant's conduct, Plaintiff, in her capacity as personal representative for the Estate of James Davies, seeks an award of compensatory damages in an amount that includes, but is not limited to, medical and burial expenses; pain and suffering before death; loss of earnings based upon the probable duration of the James Davies' life had not the injury occurred; James Davies' loss of consortium; other damages recognized in common law tort actions; prejudgment and post-judgment interest; costs of litigation; attorneys' fees; and such other and further relief as the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**(Violation of Constitutional Rights,**
**Liability Under 42 U.S.C. § 1983 – Against Sergeant Michelle Current, in**
**her Official and Individual Capacities)**

292.    Plaintiff restates and incorporates paragraphs 1 through 291 as though fully set forth.

293.    Defendant Current, in her official and individual capacity, acting under color of law, subject Agent Davies to, and caused Agent Davies to be subjected to, a deprivation of his rights, privileges and immunities secured by the Constitution of the United States of America and its Amendments.

294.   Pursuant to the Fourth Amendment and Fourteenth Amendment to the United States Constitution, Agent Davies had a right to be free from the unreasonable use of deadly force at the hands of LPD employees.

295.   Defendant Current created, promulgated, implemented, and/or was responsible for the continued operation of policies and/or customs, the enforcement of which by Defendant Current and/or Defendant Current's subordinates subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

296.   The policies and/or customs that Defendant Current created, promulgated, implemented, and/or was responsible for the continued operation of, created the need, if any, for Defendant Braley to use deadly force against Agent Davies.

297.   Defendant Current acted in a deliberately indifferent and objectively unreasonable manner through her acts and omissions that created, promulgated, implemented, continued her and others operation under, and failed to remedy the policies and/or customs that subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

298.   Defendant Current's deliberately indifferent acts and omissions included, but were not limited to the following:

    a.    Failure to establish a command center;
    b.    Failure to establish a perimeter;
    c.    Failure to create a map of the perimeter with individual officers identified and located;

d.   Failure to use proper and clear directional designations;

e.   Failure to communicate effectively and clearly with the law enforcement officers on the scene about, among other things, the tactical plans to clear the house and yard, the movement of the officers, new information as it was obtained, changing conditions as they occurred, and the status of activities of the officers on the scene;

f.   Failed to maintain her position as the Commander by abandoning her command post by declaring, "I'm out", to assist in the clearing of the house and leaving the scene to retrieve shields from Grady's vehicle;

g.   Failure to investigate, confirm or negate radioed information that, "you've got one more inside", "be advised the basement window that's facing south … I saw a light go on and off as the third person exited the house."

h.   Failure to enforce the "Buddy System" when she directed Agent Albrets to leave Agent Davies side at the northeast side of the house;

i.   Failure to take roll calls of Agents on location, determine the location of each law enforcement officer on scene and control the scene to protect the force in place;

j.   In directing Air One to leave the scene before the house, yard and perimeter were secured to the satisfaction of all law enforcement officers who were allowed to give input into the decision making process;

k.   Failure to properly  brief Braley when he arrived on the scene;

l.   Failure to properly brief the house entry team;

m.   Failure to properly utilize personnel available;

n.   Failure to properly activate and deploy SWAT in a barricaded suspect situation.

299.   Defendant Current was directly involved in and acted in such a manner that directly resulted in the deprivation of Agent Davies' Constitutional right to be free from the unreasonable use of deadly force.

300.   Defendant Current's deliberately indifferent and unreasonable acts and omissions include, but are not limited to those detailed in paragraphs 99-189 above, and these paragraphs are specifically incorporated herein.

301.    An affirmative link exists between the acts and omissions of Defendant Current's subordinates that subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments, and Defendant Current's adoption of a plan, policy, and/or custom, express or otherwise, showing Defendant Current's authorization or approval of such acts and omissions.

302.    Defendant Current set in motion a series of events that Defendant Current knew or reasonably should have known would cause others to deprive an LPD employee, including Agent Davies, of his or her rights secured by the U.S. Constitution and its Amendments.

303.    Defendant Current also personally participated in the decisions and actions that subjected Agent Davies to, and caused Agent Davies to be subjected to, a deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

304.    Defendant Current, through her own individual actions, violated the Constitution.

305.    Defendant Current acted with deliberate indifference, objectively unreasonably, heedlessly, and recklessly, without regard for the rights of LPD employees, including Agent Davies.

306.    Defendant Current's acts and omissions directly caused, proximately caused, and were the moving force behind the deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

307.   If a need to use deadly force existed, such need was unreasonably created by Defendant Current's own deliberate and reckless conduct.

308.   As a direct and proximate result of the violation of Agent Davies' right to be free from the unreasonable use of deadly force, Agent Davies suffered injuries and damages, both economic and noneconomic, in an amount to be determined at trial.

309.   As relief for the injuries caused by Defendant's conduct, Plaintiff, in her capacity as personal representative for the Estate of James Davies, seeks an award of compensatory damages in an amount that includes, but is not limited to, medical and burial expenses; pain and suffering before death; loss of earnings based upon the probable duration of the James Davies' life had not the injury occurred; James Davies' loss of consortium; other damages recognized in common law tort actions; prejudgment and post-judgment interest; costs of litigation; attorneys' fees; and such other and further relief as the Court deems just and proper.

310.   As pled above, Defendant Current's conduct was reckless and callously indifferent to the federally protected rights of LPD employees on the scene on November 9, 2012, including Agent Davies.

311.   Defendant Current's conduct was so egregious it calls for deterrence and punishment over and above that provided by compensatory awards, in the form of an award of punitive and/or exemplary damages.

## FIFTH CAUSE OF ACTION
**(Violation of Constitutional Rights,
Liability Under 42 U.S.C. § 1983 – Against Sergeant Tom Grady, in his
Official and Individual Capacities)**

312.   Plaintiff restates and incorporates paragraphs 1 through 311 as though fully set forth.

313.   Defendant Grady, in his official and individual capacity, acting under color of law, subjected Agent Davies to, and caused Agent Davies to be subjected to, a deprivation of his rights, privileges and immunities secured by the Constitution of the United States of America and its Amendments.

314.   Pursuant to the Fourth Amendment and Fourteenth Amendment to the United States Constitution, Agent Davies had a right to be free from the unreasonable use of deadly force at the hands of LPD employees.

315.   Defendant Grady created, promulgated, implemented, and/or was responsible for the continued operation of policies and/or customs, the enforcement of which by Defendant Grady and/or Defendant Grady's subordinates subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

316.   The policies and/or customs that Defendant Grady created, promulgated, implemented, and/or was responsible for the continued operation of, created the need, if any, for Defendant Braley to use deadly force against Agent Davies.

317.   Defendant Grady acted in a deliberately indifferent and objectively unreasonable manner through his acts and omissions that created, promulgated, implemented, continued his and others operation under, and failed to remedy the policies and/or customs that subjected Agent Davies to, or caused Agent Davies to

be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

318.   Defendant Grady's deliberately indifferent acts and omissions include, but are not limited to, the following:

t.   Adopting the role of a subordinate instead of a commander, when he allegedly assumed and employed command;

u.   Failing to properly communicate the plan to search the exterior of the 1940 Eaton property;

v.   Failing to announce when he and his team were exiting the residence;

w.   Failing to convey what he believed to be material information to others;

x.   Failing to sufficiently brief Defendant Braley to provide him with the necessary situational awareness;

y.   Failing to confer with Agent Albrets regarding Agent Davies' location or the location of the perimeter;

z.   Failing to properly brief and discuss the perimeter/containment positions with the entry team;

aa.   Decision to clear the house from the exterior was poorly communicated to agents outside the residence;

bb.   Failing to communicate with perimeter personnel to confirm the plan to clear the house from the exterior or to determine their positions;

cc.   Engaging in inappropriate and insufficient communications within the entry team regarding the plan to exit the house;

dd.   Failing to communicate to perimeter personnel, internal personal, or the entry team (i) when the team was exiting the house, (ii) which exit they would use, and (iii) in which direction they would move;

ee.   Failing to call out SWAT once he believed a barricaded suspect existed and there was no exigent circumstances; and

ff.   Communicating the unreasonable belief that there may have been a suspect on the exterior of the house.

319.   An affirmative link exists between the acts and omissions of Defendant Grady's subordinates that subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its

Amendments, and Defendant Grady's adoption of a plan, policy, and/or custom, express or otherwise, showing Defendant Grady's authorization or approval of such acts and omissions.

320.    Defendant Grady set in motion a series of events that Defendant Grady knew or reasonably should have known would cause others to deprive an LPD employee, including Agent Davies, of his or her rights secured by the U.S. Constitution and its Amendments.

321.    Defendant Grady also personally participated in the decisions and actions that subjected Agent Davies to, and caused Agent Davies to be subjected to, a deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

322.    Defendant Grady, through his own individual actions, violated the Constitution.

323.    Defendant Grady acted with deliberate indifference, objectively unreasonably, heedlessly, and recklessly, without regard for the rights of LPD employees, including Agent Davies.

324.    Defendant Grady's acts and omissions directly caused, proximately caused, and were the moving force behind the deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

325.    If a need to use deadly force existed, such need was unreasonably created by Defendant Grady's own deliberate and reckless conduct.

326.    As a direct and proximate result of the violation of Agent Davies' right to be free from the unreasonable use of deadly force, Agent Davies suffered injuries and damages, both economic and noneconomic, in an amount to be determined at trial.

327.    As relief for the injuries caused by Defendant's conduct, Plaintiff, in her capacity as personal representative for the Estate of James Davies, seeks an award of compensatory damages in an amount that includes, but is not limited to, medical and burial expenses; pain and suffering before death; loss of earnings based upon the probable duration of the James Davies' life had not the injury occurred; James Davies' loss of consortium; other damages recognized in common law tort actions; prejudgment and post-judgment interest; costs of litigation; attorneys' fees; and such other and further relief as the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### (Violation of Constitutional Rights,
### Liability Under 42 U.S.C. § 1983 – Against John and Jane Does 1-5,
### In Their Official and Individual Capacities)

328.    Plaintiff restates and incorporates paragraphs 1 through 327 as though fully set forth.

329.    Defendants John and Jane Does 1-5, in their official and individual capacity, acting under color of law, subject Agent Davies to, and caused Agent Davies to be subjected to, a deprivation of his rights, privileges and immunities secured by the Constitution of the United States of America and its Amendments.

330.    Pursuant to the Fourth Amendment and Fourteenth Amendment to the United States Constitution, Agent Davies had a right to be free from the unreasonable use of deadly force at the hands of LPD employees.

331.    Defendants John and Jane Does 1-5 created, promulgated, implemented, and/or were responsible for the continued operation of policies and/or customs, the enforcement of which by Defendants John and Jane Does 1-5 and/or Defendants John and Jane Does 1-5's subordinates subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

332.    The policies and/or customs that Defendants John and Jane Does 1-5 created, promulgated, implemented, and/or was responsible for the continued operation of, created the need, if any, for Defendant Braley to use deadly force against Agent Davies.

333.    Defendants John and Jane Does 1-5 acted in a deliberately indifferent and objectively unreasonable manner through their acts and omissions that created, promulgated, implemented, continued their and others operation under, and failed to remedy the policies and/or customs that subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by the U.S. Constitution and its Amendments.

334.    An affirmative link exists between the acts and omissions of Defendants John and Jane Does 1-5's subordinates that subjected Agent Davies to, or caused Agent Davies to be subjected to, the deprivation of his rights secured by

the U.S. Constitution and its Amendments, and Defendants John and Jane Does 1-5's adoption of a plan, policy, and/or custom, express or otherwise, showing Defendants John and Jane Does 1-5's authorization or approval of such acts and omissions.

335.   Defendants John and Jane Does 1-5 set in motion a series of events that Defendants John and Jane Does 1-5 knew or reasonably should have known would cause others to deprive an LPD employee, including Agent Davies, of his or her rights secured by the U.S. Constitution and its Amendments.

336.   Some of Defendants John and Jane Does 1-5 also personally participated in the decisions and actions that subjected Agent Davies to, and caused Agent Davies to be subjected to, a deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

337.   Defendants John and Jane Does 1-5, through their own individual actions, violated the Constitution.

338.   Defendants John and Jane Does 1-5 acted with deliberate indifference, objectively unreasonably, heedlessly, and recklessly, without regard for the rights of LPD employees, including Agent Davies.

339.   Defendants John and Jane Does 1-5's acts and omissions directly caused, proximately caused, and were the moving force behind the deprivation of Agent Davies' right to be free from the unreasonable use of deadly force.

340.    If a need to use deadly force existed, such need was unreasonably created by Defendant John and Jane Does 1-5's own deliberate and reckless conduct.

341.    As a direct and proximate result of the violation of Agent Davies' right to be free from the unreasonable use of deadly force, Agent Davies suffered injuries and damages, both economic and noneconomic, in an amount to be determined at trial.

342.    As relief for the injuries caused by Defendant's conduct, Plaintiff, in her capacity as personal representative for the Estate of James Davies, seeks an award of compensatory damages in an amount that includes, but is not limited to, medical and burial expenses; pain and suffering before death; loss of earnings based upon the probable duration of the James Davies' life had not the injury occurred; James Davies' loss of consortium; other damages recognized in common law tort actions; prejudgment and post-judgment interest; costs of litigation; attorneys' fees; and such other and further relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

**WHEREFORE**, pursuant to all of the above Causes of Action, Plaintiffs pray for Judgment against the Defendants, and each of them, as follows:

a.    an award of all damages available pursuant to 42 U.S.C. § 1988;

b.    medical and burial expenses;

c.    pain and suffering before death;

d.    loss of earnings based upon the probable duration of James Davies' life had not the injury occurred;

e.      James Davies' loss of consortium;

f.      all applicable damages recognized in common law tort actions;

g.      James Davies' loss of the enjoyment of his life;

h.      for prejudgment and post-judgment interest at the highest lawful rate;

i.      for costs of litigation;

j.      for attorneys' fees pursuant to 42 U.S.C. § 1988, and other potential statutory and contractual provisions;

k.      for liquidated damages;

l.      for such other and further relief as the Court deems just and proper; and

m.      for punitive damages.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES.**

**RESPECTFULLY SUBMITTED** this 7th day of May, 2014.

<div style="margin-left:40%">

/s/ Murray Ogborn
Murray Ogborn, #14508
Clayton E. Wire, #41717
OGBORN MIHM, LLP
1700 Broadway, Suite 1900
Denver, Colorado 80290
Phone: 303-592-5900
Fax:    303-592-5910
murray.ogborn@ogbornmihm.com
clayton.wire@ogbornmihm.com
*Attorneys for Plaintiffs*

</div>

Plaintiff's Address:

8924 West Capri
Littleton, CO  80123