IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 14-cv-01285-RBJ

TAMARA DAVIES, as personal representative of the Estate of James Davies,

     Plaintiff,

v.

THE CITY OF LAKEWOOD, COLORADO, and its Police Department, *et al.,*

     Defendants.

---

## ORDER

---

This order addresses four "Daubert" motions to exclude expert testimony and two other evidentiary motions.

## BACKGROUND

James Davies, an agent (officer) with the Lakewood, Colorado Police Department, was shot and killed by a fellow officer on November 9, 2012 during the course of an attempt by numerous agents to clear a residence where gunshots had been reported. His widow, Tamara Davies, as personal representative of Agent Davies' Estate, alleges that the City of Lakewood, the officer who shot Mr. Davies, and two supervising sergeants who were present are liable in money damages for violating Agent Davies' constitutional rights. Motions for summary judgment are pending and will be addressed separately.

## EXPERT TESTIMONY GENERALLY

Under Rule 702 of the Federal Rules of Evidence, a qualified expert may provide opinion

testimony if the evidence is both relevant and reliable. *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Expert opinions are **relevant** if they would

"help the trier of fact to understand the evidence or to determine a fact in issue." Rule 702(a);

*see Daubert*, 509 U.S. at 591. They are **reliable** if the expert is qualified by knowledge,

education or experience, and his or her opinions are "scientifically valid" and based on

"reasoning or methodology [that] properly can be applied to the facts in issue." *Daubert*, 509

U.S. at 593. Factors useful in this analysis include, but are not limited to, the following:

> (1) whether the opinion at issue is susceptible to testing and has been subjected to
> such testing; (2) whether the opinion has been subjected to peer review; (3)
> whether there is a known or potential rate of error associated with the
> methodology used and whether there are standards controlling the technique's
> operation; and (4) whether the theory has been accepted in the scientific
> community.

*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (citing *Daubert,* 509 U.S. at 593–
94).

But *Daubert*'s principles apply not only to scientific testimony but also to other

specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999).

"Federal Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other

witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge

and experience his discipline.'" *Id.* at 148 (quoting *Daubert,* 509 U.S. at 592). The framework

for assessing reliability is flexible. *Kechi Township v. Freightliner, LLC,* 592 F. App'x 657, 668

(10th Cir. 2014) (unpublished). Reliability generally focuses on the methodology, not the

ultimate conclusions of the expert. *Ho v. Michelin North America, Inc.*, 520 F. App'x 658, 663 (10th Cir. 2013) (unpublished).

The proponent of expert testimony has the burden to show that the testimony is admissible. *U.S. v. Nacchio*, 555 F. 3d 1234, 1241 (10th Cir. 2009). The trial court plays a "gatekeeping" role, but it has discretion as to how to perform that role. *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). Rule 702 was amended in 2000 in response to *Daubert*. The Advisory Committee observed at that time that post-*Daubert* case law had shown that "rejection of expert testimony is the exception rather than the rule." Pointedly, in view of the present case, the Committee stated that the amendment was "not intended to provide an excuse for an automatic challenge to the testimony of every expert." *Id.*[1] Cross-examination and the presentation of contrary evidence continue to be appropriate means of challenging shaky but admissible evidence. *Id.* In short, while trial courts have discretion to exclude irrelevant or unreliable evidence, *Daubert* and the 2000 amendments to Rule 702 generally liberalize the standard for admission of expert testimony. *See, e.g., Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1082 (D. Colo. 2006).

With those broad principles in mind, I turn to the task of assessing the relevance, reliability, and, ultimately, the admissibility of the challenged testimony. I will address the *Daubert* motions in the order in which they were heard and then turn to the two non-*Daubert* motions.

---

[1] With the exception of economists, the parties have raised *Daubert* challenges to all but one of each other's experts.

**A.  Defendants' Motion to Exclude Expert Testimony of Dan Montgomery [ECF No. 166]: GRANTED IN PART, DENIED IN PART.**

This motion was fully briefed upon the filing of defendants' reply brief on January 12, 2016.  An evidentiary hearing was held on January 13, 2016.  Dan Montgomery is a retired police chief.  His CV and report may be found at ECF No. 166-1.

Chief Montgomery's opinions, in summary form, are that

- the actions and inactions of Sgt. Michelle Current and Sgt. Thomas Grady were not in concert with professional police practices or with several policies, procedures and rules of the Lakewood Police Department, *id.* at 20-22;

- the actions and inactions of Agent Devaney Braley were not in concert with professional police practices or with several policies, procedures and rules of the Lakewood Police Department, *id.* at 22-26;

- the discipline administered with regard to the performance of Agent Braley was not in concert with professional police practices, *id.* at 26-29;

- post-incident investigations raised several questions about the propriety of certain Lakewood Police Department practices that may have contributed to the death of Agent Davies, including condoning a risk-taking culture; not calling out the SWAT team to save overtime costs; ignoring employee fatigue issues created by regular work schedules, overtime, and extra-duty employment; overlooking the need for senior management and supervision on the midnight shift; and not requiring

psychological fitness for duty evaluations subsequent to officer-involved shooting incidents, *id.* at 29-35; and

- the Lakewood Police Department's failure to train Sgt. Current contributed to the death of Agent Davies, *id.* at 35.

Defendants City of Lakewood, Sgt. Current and Sgt. Grady assert a multitude of arguments as to why Chief Montgomery's opinions should be excluded.  I will address their arguments in terms of their relevance and reliability.

1. <u>Relevance</u>.

For purposes of Rule 702, whether Mr. Montgomery's opinions are "relevant" depends on whether they would help the jury understand the evidence.  In my view it is beyond dispute that a lay juror is unlikely to have more than a vague notion of the standards applicable to police officers without the testimony of a qualified expert.

Defendants argue that Chief Montgomery's comparison of the officers' conduct to "professional police practices" is irrelevant because "professional police practices" amounts to Chief Montgomery's own personal standard and is designed to establish liability.  I disagree.  It is evident from a review of his report, *see, e.g.,* ECF No. 166-1 at 3 (definition of "professional police practices"), and from his testimony at the hearing, that what Chief Montgomery calls "professional police standards" is simply his way of describing what he believes to be the standard of care applicable to police officers.

Whether Agent Braley used excessive force when he shot Agent Davies turns on whether Braley's conduct was "objectively reasonable in light of the circumstances confronting him."

*Zuchel v. Spinharney,* 890 F.2d 273, 275 (10th Cir. 1989) (*Zuchel I*). [2]  Thus, compliance with

the applicable standard of care is not dispositive of the constitutional issue.  *See, e.g., Marquez v.*

*City of Albuquerque,* 399 F.3d. 1216, 1222 (10th Cir. 2005) (violation of "law enforcement

standards" is not *ipso facto* a Fourth Amendment violation).  But, expert testimony regarding the

standard of care applicable to police officers in such areas as police tactics, use of force,

administration, supervision and training is relevant to excessive force claims.  *See Zuchel v. City*

*and County of Denver,* 997 F.2d 730, 738-41 (10th Cir. 1993) (*Zuchel II*) (expert testimony

regarding generally accepted police custom and practice).  *Zuchel II* also recognized the

propriety of the expert's opinion testimony that inadequacies in the Denver Police Department's

police training program caused the shooting of Mr. Zuchel.  *Id.* at 739-40. [3]

      Defendants argue that Chief Montgomery's opinions might confuse the jury because

violation of the applicable standard of care is not *ipso facto* a Fourth Amendment violation.  I

agree that the legal standard for an excessive force determination under the Fourth Amendment

is different from the violation of the standard of care.  I do not agree that the jury will be

confused, any more than the jury was confused in *Zuchel II.*  The Court will give the jury clear

instructions on the elements of the alleged constitutional violation.  I note as well, as discussed

below, that defendant Braley is the proponent of expert testimony from an expert named William

---

[2] The circumstances might include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and actively resists arrest or attempts to evade arrest by flight."  *Id.* at 274.  The jury must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than by hindsight," taking into account that police officers "are often forced to make split-second judgments about the amount of force that might be necessary, in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 274-75.

[3] Defendants note in their reply brief that *Zuchel II* "was decided without reference or discussion of" *Daubert, Kumho Tire,* or their progeny.  ECF No. 206 at 4.  If this is a criticism of the opinion it is unwarranted.  Whether or not a *Daubert* issue was even raised in the Circuit, I see no more of a *Daubert* issue there than here with respect to the Montgomery testimony.

Everett who – unlike Chief Montgomery – is a lawyer as well as a law enforcement officer and whose opinions appear to be based both on the standard of care and the constitutional standard. That defendant, at least, appears not to be worried about jury confusion.

Defendants suggest that Chief Montgomery is providing opinions on the applicable law, and that such testimony is inadmissible under *Specht v. Jensen,* 853 F.2d 805 (10th Cir. 1988). As plaintiff points out, the Tenth Circuit rejected the same argument in *Zuchel II.* The court observed that the argument overlooks the "critical" distinction between an expert who was a lawyer specializing in constitutional law (*Specht*) and an expert who "had a doctorate in criminal justice and was an expert in police training, tactics and the use of deadly force." 997 F.2d at 742. "Courts generally allow experts in this area to state an opinion on whether the conduct at issue fell below accepted standards in the field of law enforcement." *Id.* Chief Montgomery does not purport to express an opinion on the law, *see* ECF No. 166-1 at 20, nor would this Court permit him to do so.

I do agree with defendants to the extent that Chief Montgomery's opinions that the actions of the individual officers were inconsistent with the policies, procedures and rules of the Lakewood Police Department are not admissible. *See, e.g., Tanberg v. Sholtis,* 401 F.3d 1151, 1163-64 (10th Cir. 2005). I will address that subject in more detail below in my discussion of defendant's motion to exclude consideration of inadmissible evidence in its determination of their motion for summary judgment.

2. Reliability.

Earlier I noted that opinions are generally deemed reliable for purposes of Rule 702 if the expert is qualified by knowledge, education or experience, and the opinions are scientifically

valid, if they are of a scientific nature, or otherwise have a reliable basis in the knowledge and experience of the expert's discipline.  Dan Montgomery has spent 53 years in law enforcement, serving five police departments in California and Colorado.  He retired in 2007 as the Chief of Police in Westminster, Colorado.  He has a number of degrees in related subjects, including an MS Degree from the University of Colorado in Criminal Justice Administration, and many training courses.  His lists of certifications, trainings, awards, and professional writings are lengthy.  He began consulting on a part-time basis while still serving as Westminster's police chief, and after retiring he formed his own consulting business in Arvada, Colorado.  He has been qualified as an expert in police practices in numerous federal and state courts, citing some 211 cases in 15 states during which he has been hired by police officers and governmental entities defending against misconduct allegations, citizens asserting police misconduct, and other matters.  Unsurprisingly, defendants do not question his credentials.

Another defense argument is that Chief Montgomery's opinions should be precluded because they are based on hindsight.  Well, yes, in one sense that has to be true.  Obviously, neither the experts nor the jurors were present when the incident occurred.  But, as I have said, and as the jury will be instructed, the conduct of these officers must be judged by what a reasonable officer knew or should have known at the time of the incident.

3.  <u>Conclusion</u>.

I have considered the objections to Chief Montgomery's testimony raised in defendants' motion, ECF No. 166, and further developed in their reply, ECF No. 206.  With the exception of his opinions based on the officers' violation of Lakewood Police Department policies, I am not

persuaded that any of these arguments provides a basis for exclusion of the testimony under Rule 702.[4]

**B.  Defendants' Motion to Exclude Expert Testimony of Dr. Ron Martinelli [ECF No. 181]: GRANTED IN PART, DENIED IN PART.**

This motion was fully briefed upon the filing of defendants' reply brief on January 12, 2016.  An evidentiary hearing was held on January 14, 2016.  Ron Martinelli is a forensic criminologist.  A portion of his report may be found at ECF No. 181-1.  His full report, CV, case history, fee schedule, and complete deposition transcript were provided to the Court at the *Daubert* hearing as Exhibits 1 through 5.

Dr. Martinelli has a Ph.D. in Criminology with an emphasis in forensic psychology from Columbia Pacific University in 1986.  Between 1975 and 1992 he was a police officer in Redwood City and San Jose, California.  For two years he worked in administration of a police academy and training center before returning to police work as a field training officer and detective from 1992 to 1995.  Since that time he's done a variety of things in law enforcement related fields, including consulting, teaching and writing.  He has a long list of awards and special achievements.

The objection filed by City of Lakewood, Sgt. Current and Sgt. Grady focuses on the opinions in Dr. Martinelli's report expressed at sections 5.3 and 6.14-1 through 6.14-4:

---

[4] The Court's rulings on the summary judgment motions, to be issued shortly, might render some portions of his opinions (and opinions of other experts) irrelevant, but in this order I am addressing the evidentiary motions independently.

<u>5.3</u>

Agent Braley's sudden fear reaction in response to a subject exclaiming "Hey" in a manner he describes as <u>*attempt to get his attention*</u> was not consistent with his recognized police practices and was not objectively reasonable for a number of reasons:

(1) Agent Braley does not describe the voice as loud, harsh, aggressive, or threating in a manner that would normally create an acute fear response.

(2) The agent was aware that there were numerous officers at and surrounding the property. He was aware that these officers were all armed and it would have been normal for officers involved in a critical incident to have established a perimeter surrounding the property.

(3) Agent Braley had several years of experience as a field officer and SWAT team member. He was a SWAT Assistant Team Leader and had been involved in scores of critical incidents: he had directed the establishment of perimeters and had personally manned many perimeters himself. Therefore, it would have been both a normal and an expected occasion for a police officer to be observed on the perimeter and to call out to him.

(4) It would have been a normal and expected observation that any officer on the perimeter of the property would be armed with an exposed handgun if they were searching for an armed suspect.

(5) Agent Braley was aware that the critical incident was well over one hour old by time the entry team had emerged from the residence. He was aware that Denver PD's Air-1 had been aloft for sometime prior to the entry team searching the residence.

(6) A reasonable trained and experienced officer given a similar set of circumstances would have logically determined that armed suspects do not call out to police officers if they intend to ambush them.

A reasonably trained and experienced officer would have determined that suspects fleeing a crime scene do not remain in plain view in the midst of a police helicopter and numerous officers guarding a perimeter who can easily detect and engage them and then call out to an officer for the purpose of ambushing them.

(7) Based upon Agent Braley's professional education, training, and experience as a police officer and SWAT Assistant Team Leader, including his knowledge of what had transpired at the scene to that point, it would have been unreasonable for him to believe that any suspect from the residence would have remained in plain view in or on the perimeter armed with a handgun and not have been observed and challenged by the police assets on scene.

6.14

Agent Braley's representation of his encounter with the subject of the northside fence is not supported by the forensic evidence –

6.14.1

In attempting to reconcile the crime scene and defendant Agent Braley's statements regarding his actions and encounter with the subject he fired at (Agent Davies) on the date of incident, a multidisciplinary team of forensic investigators was retained to further investigate and analyze the circumstances, statements, facts and forensic evidence previously gathered in this case.

The team members were myself, Martinelli & Associates, Inc.'s ballistic scientist and firearms expert, Lance Martini, M.S. and professional engineer Richard Ziernicki, Ph.D., of the engineering firm of Knott Laboratory, LLC.  The purpose of having our firm's ballistic scientist and firearms expert accompany me was for the advantage of peer review of my investigation and experiments.  Mr. Martini was used as my personal consultant and is not an expert in this case.

On June 1, 2014, the experts gathered at the crime scene to conduct a technical site inspection, along with physical experiments in human factors and biomechanics.  The ultimate goal of the team's efforts was, in part, to determine whether Agent Braley's statements were supported by applied science experiments and newly gathered forensic evidence, along with previously gathered evidence from the law enforcement investigation.

6.14.2

To facilitate my police practices, officer–involved shooting investigation, officer safety tactics and firearms determinations and to render expert findings and opinions, I built a replica AR-15 rifle system using the same EOTech Model 552 OEG gun sight and Surefire gun light illumination system used by Agent Braley in this incident.

To document what an officer could actually and reasonably see under daylight and night time conditions with and without illumination, I forensically recorded what could be seen using video and a special binocular focal sight video/still camera system.

Myself and ballistic scientist Martini conducted the human factors and firearms sighting and lighting experiments at night time during similar lighting conditions as were present during this incident.

For the purposes of my experiments, I used a male model (surrogate) of similar height, weight and physical description as decedent Agent James Davies, who was attired in a Lakewood PD uniform similar to that worn by Agent Davies at the time of the incident.

11

While on site, I also consulted with Dr. Ziernicki regarding the use of the surrogate, his measurements and documentation of the scene.

As a result of my site inspection and experiments, my review of the discovery evidence in this case, my review of Dr. Ziernicki's comprehensive, technical forensic engineering report and exhibits, and my professional education, training and experience in the fields of police practices, forensic investigations, forensic evidence, officer safety, tactical operations and firearms, I have arrived at the following findings and opinions based upon a reasonable degree of professional and scientific certainty:

6.14.3

Lighting – vision – observation of subject on fence – Agent Braley's statements that his rifle mounted Sure Fire lighting system provided him with sufficient illumination to see the subject, who was on and behind the north side privacy fence, is supported by my experiments.  Using the same lighting system mounted on a replica AR-15 rifle carbine similar to Agent Braley's, I was able to clearly illuminate the surrogate behind the fence from the same distance determined by investigators and Dr. Ziernicki.  Without using the EOTech 552 sight and using only the Sure Fire light system, I was also able to clearly illuminate a circle surrounding the surrogate extending out to a four foot diameter. (See photo #P1010193)

When activating the EOTech 552 gun sight in conjunction with the Sure Fire light, the area of illumination as viewed from the gun sight was reduced to an approximate three foot illuminated circle surrounding the surrogate.

I was able to clearly see and identify all of the surrogate's head, neck and upper shoulder features when his hands and arms were concealed behind the fence.  (see photos #P1010196-P1010197)

In changing the position of the surrogate to represent the portion that Agent Braley describes the subject (Agent Davies) was in and other similar type positions, I found that not only could Agent Davies have been easily and positively identified, but in some positions, the shoulder patches on the jacket Agent Davies had been wearing at the time could also be identified.  (See photos #P1010195, P1010196, P1010198, P1010199, P1010201, P10101202, P11010203, P1010204)

I also found that the Sure Fire Model P91 lighting system used by Agent Braley on the date of incident puts out 200 lumens of light.  This is significant illumination upon any targeted area at distances of 30 feet or less.  This level of illumination causes a significant reflection and clarity in readily identifying a subject with a Caucasian (very light completed [sic]) skin tone as Agent Davies had.

6.14.4

Sight picture – How much he could see of subject on fence – Agent Braley states that through his sight, he could see that most of the subject's (Agent Davies's face was actually above the fence. He states that he only had a side view, rather than a straight on facing (him) view of the subject.

Based upon my review of Agent Davies' autopsy report, my personal experiments and my review of Dr. Ziernicki's forensic report, I make the following findings and opinions to a reasonable degree of professional, scientific and medical certainty:

(1) It is far more likely than not that Agent Davies was directly facing Agent Braley when the agent fired upon Agent Davies.

(2) From a straight on, facing (each other) position, Agent Braley should have been able to identify Agent Davies from a Hispanic male, or any other similarly completed [sic] male with a shaved head.

(3) Agent Braley may have been able to identify that the subject on the fence (Agent Davies) was a uniformed officer, dependent upon Davies' position on and behind the fence. (Dr. Ziernicki's Report, pp. 44: Fig. 43; See M&A photos ##P1010195, P1010196, P1010198, P1010199, P1010201, P10101202, P11010203, P1010204).

(4) Agent Braley's assertion that he was unable to identify the subject (his target) as Agent Davies is not supported by the forensic evidence.

1. Relevance.

To the extent Dr. Martinelli's testimony concerns the standard of care applicable to police officers, it is relevant for the same reasons as I found Chief Montgomery's testimony on that subject to be relevant. Further, his testimony concerning his participation with Dr. Ziernicki and others in the creation of a reconstruction of the incident would be helpful to the jury and is relevant.

I agree with the defendants that he should not express opinions in terms of what is "objectively reasonable." For one thing, while he labels that "his terminology" and not the use of the legal standard for excessive force, it is potentially confusing. In addition I will apply the

same rule to Dr. Martinelli as I will apply to Agent Braley's expert, Mr. Everett (below) and

other experts.  Although an expert opinion is not automatically objectionable just because

embraces an ultimate issue, Fed. R. Evid. 704(a), I will exercise my discretion to preclude such

expressions of opinion in this case.  As for Dr. Martinelli it appears to be a moot point in any

event, as counsel assured the Court that he would not describe officers' conduct as "objectively

reasonable," or "not objectively reasonable," or as "deliberately indifferent" or similar phrases

which the jury will resolve as necessary based on appropriate instructions of law.

I also agree with defendants that it would not be helpful to the jury to have Dr. Martinelli

or other experts essentially speculate on what Agent Braley was thinking, seeing, or hearing.

That can easily be avoided.  Take, for example, the phrase at the beginning of section 5.3 to

which defendants objects: "Agent Braley's sudden fear reaction in response to a subject

exclaiming, 'Hey' in a manner he describes as *attempting to get his attention* was not consistent

with his recognized police practices and was not objectively reasonable for a number of

reasons."  Literally it does not speculate on what Braley was thinking, but it might be confusing.

I would not have a problem if he were to express the same idea differently, such as, "A sudden

fear reaction in response to a subject exclaiming, 'hey' in a manner appearing to be an attempt to

get one's attention is not consistent with recognized police practices and is not consistent with

the standard of care for a number or reasons."  Another acceptable alternative would be, "If one

assumes hypothetically that Agent Davies said 'Hey' in a manner described as attempting to get

Agent Brady's attention, then in my opinion a sudden fear reaction would not be consistent with

recognized police practices or the applicable standard of care for a number of reasons."  I am not

trying to dictate the wording of counsel's questions.  Rather, I am providing examples that might

help to explain the line between that which I would find objectionable and that which I would not. Counsel should be able to apply this reasoning to Dr. Martinelli's opinions generally. Defendants criticize some of Dr. Martinelli's opinions as conclusory and lacking a methodology, citing as an example the statement, "A reasonably trained and experienced officer given a similar set of circumstances would have logically determined that armed suspects do not call out to police officers if they intend to ambush them." But the context is that this sentence is just part of the sixth of seven reasons that Dr. Martinelli provides in support of his overall opinion in section 5.3. His overall opinion is not conclusory, and the particular sentence can be explored if desired on cross-examination or rebutted by a defense expert. As for methodology, the word doesn't necessarily fit an opinion that is based on Dr. Martinelli's education, training and experience as a law enforcement officer and consultant. Again, there might be better ways to phrase the opinion, such as, "Based on my experience as a police officer, and the training I received and have conducted for police officers, I believe that a police officer who had received training and experience consistent with the standards in the industry would probably believe that armed suspects do not often call out to police officers if they intend to ambush them." Then that statement can be challenged in any number of ways, but it is not irrelevant.

2. <u>Reliability</u>.

Dr. Martinelli has sufficient credentials to express opinions regarding the standard of care applicable to police officers. He is in much the same position as the expert in *Zuchel.* As for his section 6.14 opinions, the reliability objection is largely a criticism of Dr. Ziernicki's reconstruction. Dr. Ziernicki determined the positioning of Agent Davies based on his understanding and interpretation of the physical evidence. To the extent the jury is not

persuaded, then conclusions that Dr. Martinelli drew from the reconstruction presumably would be equally suspect.

But challenges to Dr. Ziernicki's reconstruction do not impugn the reliability of Dr. Martinelli's role in the reconstruction.[5]  Dr. Martinelli brought his education, training and experience in police matters to the project.  Defendants do not show (or claim) that Dr. Martinelli did not competently build a replica AR-15 rifle using the same gun sight and illumination system, or that he did not activate it properly.  Once again, I agree that certain opinions could be expressed differently and in a way that avoids any confusion about what he is saying.  For example, when he says that "Agent Braley should have been able to identify Agent Davies from a Hispanic male," it would be better to say something like, "Based on the reconstruction, it is my opinion that a trained and experienced police officer with normal vision probably would have been able to distinguish Agent Braley from a Hispanic male."  Perhaps better yet, "The jurors can evaluate the reconstruction and decide for themselves whether a trained and experienced police officer with normal vision would have been able to distinguish Agent Davies from a Hispanic male in the conditions that existed immediately before the shots were fired."  The phrasing of counsel's questions is not my task.  I am satisfied that if questions and answers are expressed with the principles of this order in mind, there is not a reliability issue or a relevance issue.

I do agree that it would not be proper for Dr. Martinelli (or Chief Montgomery) to praise Dr. Ziernicki's report, such as his deposition testimony describing "Dr. Ziernicki's very extensive and I believe very well done report – it had to have been one of the best I've ever

---

[5] I discuss defendants' Rule 702 challenge to Dr. Ziernicki later in this order, but suffice it to say here that I disagree with defendants.

seen." Of course, if the defendants were to open the door (for example, "Why did you rely on Dr. Ziernicki's report?") my ruling would likely be different.

 3. <u>Unfair prejudice</u>.

 Defendants also assert that Dr. Martinelli's opinions are unfairly prejudicial under Rule 403 because he is putting the imprimatur of an expert on opinions that are speculative and unreliable. I have excluded his opinions to the extent that I found them to be speculative, and I certainly will apply that standard at trial.

 Defendants note that Dr. Martinelli stated in one place, "I make the following findings and opinions to a reasonable degree of professional, scientific, and medical certainty." In my view, phrases of this kind are unnecessary. *See, e.g., Talavera ex rel. Gonzalez v. Wiley,* 735 F.3d 1262, 1274 (10th Cir. 2013) ("Talavera points to no authority in support of her position that an expert must invoke the phrase, 'reasonable degree of medical certainty' or some other shibboleth to allow a court to consider the expert opinion"). Worse yet, Dr. Martinelli's expression is inaccurate. He has no evident medical expertise that would enable him to express opinions with medical certainty, and his opinions in the main are not "scientific" as such.

 He may tell the jury what his opinions are (subject to this Court's Rule 702 rulings) and explain the basis for the opinions. If counsel believes that there is some case law that requires opinions to be expressed to some "reasonable degree of probability certainty," then keep it short, simple: "My opinions are expressed to a reasonable degree of probability within my field of expertise," or something similar. There is no need to aggrandize the opinions with legalese.

4.  Conclusions.

I agree with some of defendants' criticisms and have provided both general guidelines and specific examples.  Generally, however, Dr. Martinelli's opinions concerning the standard of care and how it applies to facts such as those here, and his participation in the Ziernicki reconstruction, are not excludable under Rule 702 and the *Daubert* cases.

**C.  Defendant Braley's Motion to Exclude Expert Testimony of Dr. Richard Ziernicki [ECF No. 179]: DENIED.**

This motion was fully briefed upon the filing of defendants' reply brief on January 19, 2016.  An evidentiary hearing was held on January 27, 2016.  Richard M. Ziernicki, Ph.D., P.E. is a mechanical engineer and the President of Knott Laboratory, LLC, a forensic engineering company with its headquarters in Centennial, Colorado.  His report is found at ECF No. 144-16 through 144-19.

Agent Braley, through counsel, argues that Dr. Ziernicki's opinions are unreliable because they are based on speculation regarding Agent Davies' position on the fence. Specifically, he argues that

- Dr. Ziernicki's opinion that Agent Davies' face and head were visible to Agent Braley is based on a helicopter video taken an hour before Davies was shot; his own bullet trajectory reconstruction; and a surrogate study in which a person of Davies' height stood on the same ladder at the same fence.  None of those facts provide a sufficiently reliable basis to support the opinion.

- Ziernicki ignores an abrasion on Agent Davies' nose that suggests (on the assumption that the abrasion was caused by his nose hitting the fence after he was shot) that Davies' face was closer to the fence than Dr. Ziernicki thinks.

- From the position Dr. Ziernicki places Davies on the fence, he would have had to bend his wrist at an unnatural and awkward angle, making it nearly impossible to target Agent Braley as plaintiff contends.

Plaintiff responds that Dr. Ziernicki and his team conducted an extensive investigation which included inspection, measurement and laser scanning of the shooting site; his bullet trajectory analyses; reconstruction of the shooting by applying engineering methods of shooting reconstruction to the physical evidence; creation of a virtual model of the shooting scene; analyzing various positions and poses of Braley and Davies in comparison to the physical evidence; and conducting bio-mechanical studies of potential movements and poses to eliminate those which were unlikely.

Thus, the helicopter video of Agent Davies standing in an upright position on a ladder and remaining in the same location and position throughout the video footage was one objective physical fact that was used to test and confirm Ziernicki's opinion that Davies was probably standing upright on the ladder when he was shot. Dr. Ziernicki testified, without contradiction, that his reconstruction followed scientific methods and principles.

1. Relevance.

Agent Davies' positioning and movements, including where and how he was holding his weapon, immediately before he was shot are important facts in this case. Apparently Agent Braley is the only available eye witness to these facts. But one must bear in mind that Braley's

19

defense is that it was objectively reasonable for him to have mistakenly thought that Agent

Davies was a suspect who was pointing a gun at him, given the circumstances with which he was

confronted and the split-second he had to decide whether to shoot.  Those same facts could

potentially affect the reliability of Agent Braley's recollection of exactly where and how Agent

Braley was positioned and his movements.  Therefore, a competent reconstruction based on

physical evidence would be of assistance to the jury in assessing Agent Braley's testimony and

determining facts in issue.  Indeed, both sides wish to present expert testimony on that subject.

2.  Reliability

Dr. Ziernicki has extensive credentials as a mechanical engineer.  His qualifications have

not been challenged.  There is no evidence that he did not follow scientific methods in his

investigation.  There is no contention that what he did was in any manner "junk science."  On the

contrary, his testimony at the January 27, 2016 hearing, mostly consisting of responses to cross-

examination by Agent Braley's counsel, strengthened the impression I had formed from his

report that he relied on physical evidence and recognized scientific methods of reconstruction in

forming his opinions.

One can challenge the facts on which he based his opinions (as did Braley's two experts,

William Spence and William Everett, to some extent) but that is not uncommon in litigation.

Counsel argued that Dr. Ziernicki's admission at the hearing that he did not know exactly how

Agent Davies' head was positioned immediately before the shooting shows that the opinion does

not "fit" and would not be helpful to the jury.  I disagree.  To my mind, the admission simply

emphasizes that Dr. Ziernicki's opinion was not based on facts that he did not (and could not)

know with certainty.  Dr. Ziernicki's opinion is that based on the marks left by the fatal bullet on

the wall and adjacent cable, and the exit wound, he can determine where Agent Braley's head

was when the shot was fired.  One can agree or disagree with his opinion.  But disagreement with

it does not mean that it is not "reliable" within the meaning of Rule 702.

**D.  Plaintiff's Motion to Limit the Expert Opinion Testimony of William Spence and William Everett [ECF No. 187]: GRANTED IN PART, DENIED IN PART.**

This motion was fully briefed upon the filing of plaintiff's reply on January 27, 2016.

Defendants' response was filed January 22, 2016.  An evidentiary hearing was held on January

28, 2016.  William Spence is a retired law enforcement officer who was a member and chair of

the "Incident Review Board" that investigated the Davies incident.  His report is found at ECF

No. 187-1.  William J. Everett is a lawyer and a former law enforcement officer.  He presently

has his own law enforcement training company.  His report is found at ECF No. 187-3.

1. <u>Selective Attention and Inattentional Blindness.</u>

Before turning to other opinions expressed by these gentlemen, I will address one

common theme.  Both experts discuss "selective attention," and Mr. Everett also discusses

"inattentional blindness."  These are psychological terms, but in substance they are the same or

similar as the less fancy terms, "tunnel vision" and "tunnel hearing."  Broadly speaking, these

concepts relate to matters of attention, perception and memory.  Mr. Spence and Mr. Everett

apply these concepts to what Agent Braley might have heard on the radio as he drove to the

scene, what he plausibly might not have heard, and what he might have seen and focused on

when he confronted the individual who turned out to be Agent Davies.  Mr. Everett, more so than

Mr. Spence, delves into the literature on selective attention and inattentional blindness to explain

and bolster his opinions.

Simply put, I find that neither Mr. Spence nor Mr. Everett has the qualifications to render reliable opinions on these subjects.  On the contrary, I found credible and persuasive the testimony of Lisa R. Fournier, Ph.D., a psychologist and professor of psychology at Washington State University, concerning the qualifications of Mr. Spence and, in particular, Mr. Everett.  For example, she reviewed the articles on which Mr. Everett relied, and she expressed the opinion that most of them are not valid or reliable due to flaws in research design and lack of statistical analysis to show reliability.  In other instances she found that the articles were misrepresented.  Dr. Fournier backed up her testimony in a lengthy report marked as hearing exhibit 4.

This is not to say that Mr. Spence and Mr. Everett are necessarily prohibited from mentioning the terms "selective attention" and "inattentional blindness."  To the extent that they can testify that those terms are regularly used and taught in training police officers, and that the standard of care requires some training and knowledge of the concepts, then that much would be within their expertise.  I do not have a Rule 702 problem with their explaining how and why the terms have become part of the regular curriculum in police officer education.  I also would not have a problem with their discussing, as present and former police officers, their experience when driving and receiving radio calls.

But these experts must stay within the boundaries of their expertise.  They are not to discuss the literature or attempt to explain brain functioning in any scientific or technical way.  They may not express speculative opinions about what Agent Braley heard or didn't hear, saw or didn't see, nor that it is plausible to believe his testimony because of these concepts.  Depending on how the evidence comes in, it may be that counsel in closing could properly urge the jury to

infer that Agent Braley might not have heard or seen certain things due to these concepts that are taught in police academies.

    2. <u>Mr. Spence's Other Opinions</u>.

I summarize what I take to be his primary other opinions as follows:

- Agent Davies positioned himself in a tactically poor location, contrary to his training. His positioning is "an example of the risk-taking culture with the police department that Sgt. Current and other agents mentioned." The supervisors failed to guard against this risk-taking mentality and did a poor job of supervising. *Id.* at 10-12.

- Agent Davies' positioning and behavior made it more likely that he would be misidentified as a suspect. He mentions Davies' failure to radio his location; wearing of an "old style dark Navy coat;" failure to use his flashlight; and failure to identify himself as a police officer, instead saying "hey" in the slurred voice of an intoxicated person; and moving his weapon towards Braley instead of dropping it when Braley said "drop your gun." *Id.* at 12-13.

- Agent Braley's decision to use deadly force was "objectively reasonable." He lists the following items in support of this opinion: (1) Braley was well trained; (2) that the night was dark; (3) Davies' view was obstructed; (4) Davies' flashlight was "not entirely reliable" (citing Agent Albret's statement that he thinks Davies' flashlight battery was getting low); (5) Braley was aware that shots had been fired and that Sgt. Current had observed an individual fire a round and aired that she was pinned down behind a tree; (6) the residence housed an individual with previous gang affiliation and police contacts; (7) one was yelling, uncooperative and combative; (8) a handgun

magazine but no handgun was found inside the residence; (9) he had been told that there was still one armed male outstanding; (10) Sgt. Current had decided to clear the house from the outside; (11) Sgt. Grady said that the backyard had not been cleared; (12) that the two officers behind Braley in the "stack" encouraged him by saying, "we're good, we're with you;" (13) the two officers did not expect another officer to be where Davies was; (14) Davies sounded like an intoxicated individual; (15) Davies did not use his flashlight; (16) Davies' appearance mirrored "the schema of an armed assailant;" (17) Davies might not have heard Sgt. Current's radio transmission that the team was going to clear the residence from the outside; a reasonable officer who heard that would have strongly considered moving to the cover of the apartment building or a tree; (18) Davies probably turned his face sideways and squinted due to Braley's rifle-mounted flashlight (making identification more difficult); (19) Davies likely was confused by being challenged and ordered to drop his gun; (20) alternatively, Davies might have believed the command was directed at someone else; (21) Davies did not drop his gun on command; (22) Davies' head rotated between Braley's first observation and its position when he was shot; (23) Davies' movement of the gun is consistent with four scenarios (he might have thought Braley had seen a suspect; your gun moves where your eyes look; he moved his right hand to shield his squinting eyes from the bright light; he moved his right arm to maintain balance on the ladder); (24) the fact that Agent Okamura heard "Gun, gun, he's got a gun, he's got a gun, drop the gun" before Braley shot shows that Braley was disciplined. *Id.* at 13-17.

- He does not agree with Dr. Martinelli's opinion that Agent Braley did not adhere to the "Cardinal Rules of Firearm Safety" when he failed to identify his target and what was behind it. Those rules are designed to prevent accidental shootings, not to prevent law enforcement officers from carrying out their duties or defend themselves. The rules do not prohibit officers from shooting at dangerous suspects in defense of their lives, and Braley concluded that he faced an imminent deadly threat from Davies' non-uniformed appearance, his failure to identify himself, and his lack of physical compliance. Moreover, to be consistent with those Rules, Dr. Martinelli should have considered that Agent Davies was pointing his gun at Agent Braley, contrary to those rules.

- He finds Dr. Ziernicki's use of high definition laser scanning and computerized technology to recreate the scene to be "interesting" but of "marginal value." The positioning of Davies' arm in the computerized rendition is "dubious," because it is an unnatural position. The analysis of where the bullets struck brick conflicts with Dr. Martinelli's assertion that Agent Braley did not consider the background. The analysis of the shot pattern does not support Dr. Martinelli's opinion that Braley fired in a "hyper vigilant response" because it did not account for the difference between the stress of engagement in lifesaving measures versus qualification at a police range. Statistically, inaccurate shot placement occurs 86% of the time in real-life situations. *Id.* at 18-19.

3. <u>Mr. Everett's Other Opinions</u>.

I summarize what I take to be his primary other opinions as follows:

- A reasonable person in Agent Braley's circumstances would have concluded that the person at the fence with a gun posed an imminent threat of death or serious physical injury. He says that in accordance with two U.S. Supreme Court opinions, police officers are trained to limit deadly force to circumstances where the suspect poses a threat of serious physical injury to the officer or others, and to give warning before using deadly force if it is feasible to do so. He lists things that he says Braley "knew" and could reasonably infer before he approached the backyard, somewhat similar to Mr. Spence's list, all of which would make him vigilant about the presence of an armed shooter when approaching the backyard. ECF No. 187-3 at 7-8.

- Davies' (1) location along the north privacy fence; (2) visibility (as shown in Dr. Ziernicki's reconstruction, which indicated that only Davies' head and firearm were visible); (3) manner of displaying a firearm (the muzzle was pointed at Braley, apparently relying on Braley for that); and (4) ambiguous verbal communications "did nothing to disconfirm concerns that he was in fact an armed suspect." *Id.* at 8-9.

- Officers are trained that if they are facing an armed suspect but wait for the suspect to initiate the movements involved in firing a weapon, the suspect probably will shoot before the officer can respond. Based on studies, a suspect could raise and fire a handgun faster than an officer carrying a shoulder-fired weapon. A reasonable officer would therefore understand that "any time he spent studying or assessing the situation before acting would elongate his exposure to grave and immediate peril." *Id.* at 9-10.

- A reasonable officer in Braley's circumstances would have concluded that the use of deadly force was objectively reasonable. Mr. Everett states that his analysis is based

on two Supreme Court cases.  The courts have recognized that officers must make split-second decisions based on the information known to them at the time, without 20/20 hindsight.  It is "constitutionally inappropriate" to postulate about what Braley could have learned or done if different pre-confrontation tactics had been employed. *Id.* at 10-11.

- Dr. Ziernicki's reconstruction did not take into account Agent Albret's observations that the platform on which Agent Davies was standing was unstable and that Davies was acting like a trained officer when his gun moved in unison with his eyes.  But even assuming that the reconstruction is accurate, it does not change the conclusion that a reasonable officer in Braley's position would have perceived himself to be in immediate peril.  *Id.* at 11.

- A reasonable officer in Agent Braley's position would not have gleaned Agent Davies' location from earlier radio traffic, essentially listing the same or similar reasons as did Mr. Spence.  *Id.* at 12-13.

- It is not reasonable to expect Braley to recognize Davies as a fellow law enforcement officer in the brief time available to him.  It is doubtful that an officer in Braley's position could have facially recognized Agent Davies at more than 20 feet in a darkened area, especially given the context that suggested that Davies was an armed assailant, the gun in Davies' hand, and the action/reaction deficit that Braley was in. *Id.* at 13-14.

4.   Plaintiff's Objections.

I have addressed objections relating to selective attention and inattentional blindness above.

In general plaintiff argues that the studies and articles relied upon by Mr. Spence and Mr. Everett are not reliable.  *Id.* at 7-9.  Specifically, plaintiff argues that Mr. Spence's opinions on "blue on blue" shootings are unreliable because they are based on an unpublished, non-peer reviewed survey study that he published in another non-peer reviewed article.

Plaintiff argues that Mr. Everett's opinions improperly invade the province of the court and the jury, citing *Specht v. Jensen, supra.  Id.* at 10-11.

5.   Relevance.

The Court finds that in significant part the opinions expressed by Mr. Spence and Mr. Everett would not be helpful to the jury.  Their speculation about what Agent Braley knew is not helpful.  Their opinions about what Agent Braley saw or heard would not be helpful.  The jury is as capable as these experts in making those findings.  If anything, the jury is more capable of making independent findings on those subjects because, unlike Mr. Spence in particular, they are not necessarily wed to the credibility of what Agent Braley says.  It will not be helpful to the jury to hear Mr. Everett, a lawyer, educate them on legal concepts.  It will not be helpful to the jury to have either of these gentlemen opine on whether Braley's decision to shoot was objectively reasonable – the same type of testimony that the defendants vigorously opposed if ventured by Chief Montgomery or Dr. Martinelli.  My overall reaction to the reports of Mr. Spence and Mr.

Everett was that they were overreaching to the point that they tended to obscure the credibility of opinions that might be helpful to the jury.

However, I do find that certain things that these two gentlemen have to say would be potentially helpful to the jury and therefore relevant within the meaning of Rule 702.  Mr. Spence's opinions on the standard of care applicable to Agent Davies' actions, and Davies' failure to adhere to that standard, might be helpful to the jury in understanding defendant's causation argument.  With respect to the 24 items (my numbers) that supported his opinion on objective reasonableness, if he omits items 17-20 and 23 (which are pure speculation on his part), assumes the truth of a set of hypothetical facts that match the remainder of the list, and expresses an opinion as to whether based on the assumed facts firing was within the standard of care applicable to police officers, I would find that testimony to be helpful to the jury.  His explanation of the Cardinal Rules of Firearm Safety and his opinion that the rules did not address the situation where an armed suspect points a gun at the officer would similarly be "relevant," as would his disagreement with Dr. Martinelli's analysis of the shot pattern.  His comments on Dr. Ziegler's reconstruction might possibly be viewed as "relevant" (*but see* reliability findings below).[6]

As for Mr. Everett, if he is provided a hypothetical set of facts (as opposed to his doing the fact-finding or speculating) as to what Agent Braley purportedly saw and heard, I would again find that his opinion as to whether firing would have complied with the standard of care to

---

[6] Mr. Spence obviously is in a position to discuss what the Incident Review Board did and the conclusions to which it came.  However, all defendants have objected to plaintiff's use of the IRB investigation and report, and later in this order I address that objection.  *See* discussion of ECF No. 168 *infra.*  Defendants will be bound by the results of their own motion, and thus, Mr. Spence's ability to discuss the IRB investigation and report will be limited at best.

be relevant.  His opinions based on studies regarding the average time it takes to raise and fire

handguns and rifles from different starting positions would be relevant (and plaintiff can

certainly cross-examine or introduce contrary evidence on the studies if she wishes).  If he is

given hypothetical facts consistent with what he attributes to Agent Albret, and he further

assumes that Dr. Ziernicki did not consider those facts, then his opinion that this weakens the

reconstruction would be relevant.  His opinion that Dr. Ziernicki should have taken those facts

into account would be relevant.

But, for emphasis, I repeat that his comments on the law, the definition of the

"objectively reasonable standard," and his speculation about what Agent Braley knew or didn't

know, saw or didn't see, are not relevant.

5. <u>Reliability.</u>

Both gentlemen have credentials in law enforcement that I find to be sufficient to make

their opinions reliable, so long as they confine their opinions to the subjects that I have found to

be relevant.  Neither gentleman has the qualifications to comment on the scientific basis for the

Ziernicki reconstruction, with the single exception I noted above concerning Mr. Everett's

opinion based on the hypothetical statements his report attributes to Agent Albret.

**E. <u>Plaintiff's Motion to Strike, Exclude or Limit the Expert Opinion Testimony of</u>**

**<u>Michelle Hoffman and Parris Ward [ECF No. 171]: DENIED</u>.**

Michelle Hoffman is a biomechanical engineer employed by Biodynamics Engineering,

Inc. of Pacific Palisades, California.  Parris Ward, who also is employed by Biodynamics

Engineering, is a lawyer by education but has developed expertise in videography and computer-

generated graphics.  Together they were engaged by counsel for Agent Braley to provide

opinions and testimony in rebuttal to the expert opinions and testimony of Dr. Ziernicki.  Their

report is found at ECF No. 171-1.  Excerpts from the deposition of Ms. Hoffman are found at

ECF No. 171-8.  Excerpts from the deposition of Ms. Ward are found at ECF No. 171-7.

Plaintiff's motion to exclude or limit their testimony became ripe upon the filing of her reply

brief on January 14, 2016.

This is not a *Daubert* motion.  Plaintiff has not objected to the credentials of the experts

or to the relevance or reliability of the opinions expressed in their report.  No party has requested

a hearing.  The objection essentially is one of fairness.  Some background is necessary.

Early in this case plaintiff's counsel advised the defendants that they wished to take the

deposition of Agent Braley in two parts.  The first part of the deposition would take place at a

mock-up of the scene of the shooting created at Knott Laboratory, the forensic engineering firm

of which Dr. Ziernicki is the President; the second part of the deposition would follow a

traditional in-office format.  The purpose of the first part was to videotape Agent Braley as he

demonstrated the positioning of Agent Davies and himself and their respective actions as a

preliminary step to the second phase and to assist plaintiff's team in creating their own

reconstruction.  Counsel for Agent Braley objected.

I conducted a hearing by telephone on December 10, 2014.  Agent Braley's counsel

voiced several objections to the demonstration procedure.  First, he stated that the incident was

"a very emotional and traumatic event of Officer Braley.  And putting him through this

demonstration, reenactment, I think is truly going over the top."  Transcript, ECF No. 35, at 6.

Second, he argued that plaintiff could obtain the information necessary to do a reconstruction in

a traditional deposition where Agent Braley would answer their questions and even demonstrate

his movements and actions in the office setting.  *Id.*  Finally, he noted that a great deal of

information had already been created about the various locations of people through police

investigations, adding to plaintiff's ability to accomplish its objective without putting Agent

Braley through the type of demonstration that plaintiff sought.  *Id.* at 7.  When I inquired whether

this was counsel's position or Agent Braley's position counsel indicated that he and Agent

Braley shared the concern.  *Id.* at 13.

      The Court sustained Agent Braley's objection in a written order issued on January 7,

2015.  ECF No. 34.  The Court found "that asking Agent Braley to demonstrate his earlier action

at a mock-up of the scene of the shooting would impose a burden that outweighs the likely

benefit of such a demonstration [which] would require the officer to relive what must be the most

traumatic and tragic incident of his life, imposing a heavy emotional burden."  *Id.* at 2.  I further

found that "it is all but impossible to recreate exactly an incident that occurred quite some time

ago, and the plaintiff's attorneys can discover essentially the same information through

traditional questioning."  *Id.*

      Approximately seven months later Agent Braley's counsel arranged for Agent Braley to

spend approximately 5-6 hours with experts Hoffman and Ward at the actual scene, walking

them through the incident, demonstrating his actions, posing for pictures, and assisting them in

creating their own reconstruction and rebuttal to Dr. Ziernicki's opinions.  ECF No. 171-1 at 8-

11; ECF No. 171-7 at 9 (depo. of Ms. Ward, p. 125); ECF No. 171-6 at 2-3 (interrogatory

answers of Agent Braley).  It is no wonder that plaintiff cries foul.  If participating in the

demonstration requested by plaintiff was too emotionally traumatic for Agent Braley, then how

does one account for his participation when his own lawyer requested it?  If Agent Braley's

deposition testimony and other available information were sufficient to assist plaintiff's experts in creating a reconstruction, then why did defendant Braley's experts need Agent Braley's extensive on-scene assistance?  I now find that defendant's reasons for objecting to Agent Braley's participation in the demonstration requested by plaintiff were exaggerated at best and, if counsel anticipated at the time that he would later ask Agent Braley to participate in a "demonstration/reenactment" of his own, misleading at worst.[7]

Nevertheless, I exercise my discretion to decline plaintiff's request to exclude the testimony of Ms. Hoffman and Ms. Ward under the doctrine of judicial estoppel or otherwise.  In my judgment that would be an overreaction for several reasons.  First, this is relevant evidence that would assist the jury in evaluating Dr. Ziernicki's testimony and, ultimately, in determining what likely happened.  Second, exclusion of the evidence would deprive Agent Braley of an expert rebuttal to the Ziernicki evidence, and I am not satisfied that this would be fair to him.  Although counsel indicated that both he and Agent Braley were concerned about plaintiff's proposal, I suspect that counsel was the driving force.  Finally, and most importantly, although Ms. Ward herself admitted that having Agent Braley available to them at the scene gave them an advantage over Knott Laboratory, ECF No. 171-7 at 3 (depo. p. 76), I find that Dr. Ziernicki was able to develop his reconstruction and opinions quite capably based on the physical evidence without the demonstration plaintiff requested; put another way, I do not find significant unfair prejudice to the plaintiff from allowing this evidence.

---

[7] Counsel now offers, "in the event the Court has any concern," to make Agent Braley available at the site in the presence of Dr. Ziernicki to do a demonstration for him.  ECF No. 193 at 7-8.  I leave it to plaintiff and Dr. Ziernicki to decide whether another inspection would be helpful and cost-effective, but it does not fix the problem.  Any opportunity plaintiff had to pin Agent Braley down to a visual depiction of the incident before Dr. Ziernicki and plaintiff's standard of care experts did their work and before Agent Braley's recollection was potentially affected by such things as his participation in the defendant's experts' site inspection has been lost.

However, I essentially warned Agent Braley's counsel during the argument on his objection to plaintiff's requested deposition demonstration that if he "opened the door," I would permit plaintiff to inform the jury of defendant's objection to having Agent Braley participate in a demonstration or re-creation of the incident. *See* ECF No. 34 at 10-11. If counsel calls Ms. Hoffman or Ms. Ward and solicits opinions consistent with their report, the door will have been opened. Even if defendant does not call Ms. Hoffman or Ms. Ward, the door will have been opened if any defendant suggests or implies that plaintiff's reconstruction is faulty because it described the positioning or actions of Agent Braley or Agent Davies inconsistently with Agent Braley's testimony. If the door is opened, the Court will permit the jury to be informed of defendant Braley's objection to plaintiff's proposal, the reasons given, the Court's acceptance of the reasons at the time, Agent Braley's later participation in the defendant's experts' inspection and reconstruction, and the Court's present views, in a manner that appears to be most appropriate in the context in which the matter arises.

Plaintiff also objects to the report and opinions of Ms. Hoffman and Ms. Ward on the alternative ground that it is improper rebuttal evidence. Their report was based on information created after the Ziernicki report, but that by itself does not render the report improper rebuttal. One cannot rebut what one has not seen, and if it is necessary to develop evidence on which to base rebuttal opinions, so be it. If Ms. Hoffman and Ms. Ward expressed opinions based on their July 23, 2015 site inspection and Agent Braley's assistance during that inspection, and ignored his previous statements, that does not necessarily render the consequent opinions improper rebuttal. The Court had addressed the consequence of opening that door, and plaintiff can point out inconsistencies in the Braley statements in cross-examination and otherwise.

However, plaintiff notes that Ms. Hoffman herself admitted in her deposition that their opinions extend beyond rebuttal of the Ziernicki/Knott Laboratory opinions. *See* Motion, ECF No. 171, at 12 (citing ECF No. 171-8 at 2, depo. p. 48). I agree with plaintiff that to any extent the opinions expressed at trial by either Ms. Hoffman or Ms. Ward go beyond a true rebuttal to the Ziernicki opinions as opposed to opinions that should have been disclosed when defendant's original expert disclosures were due, they would be improper and will be excluded. I decline to rule on specific testimony *in limine;* I can better assess whether any opinions of Ms. Hoffman or Ms. Ward are truly rebuttal, if necessary, after hearing what Dr. Ziernicki testifies to at trial. But I caution counsel for defendant Braley that I expect him or her to cull out and to refrain from attempting to solicit any opinions that are not true rebuttal.

### F. **Defendants' Motion to Preclude Consideration of Inadmissible Evidence in Determination of Summary Judgment [ECF No. 168]: GRANTED IN PART, DENIED IN PART.**

Each of the four defendants has filed a motion for summary judgment. ECF Nos. 114, 115, 116 and 119. Plaintiff has filed two motions for partial summary judgment. ECF Nos. 122 and 123. The Court will address those motions in a separate order. However, the familiar ground rules are set forth in Rule 56. A motion for summary judgment must be granted if the moving party shows that there is no genuine dispute as to any material fact, and that it is entitled to judgment as a matter of law. Rule 56(a). A party must support its assertion that a fact is or is not genuinely disputed and can do so in either of two ways: (1) citing to materials in the record such as depositions, documents, affidavits, admissions, or interrogatory answers, Rule 56(c)(1)(A); or (2) showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact. Rule 56(c)(1)(B).

In the pending motion defendants remind the Court of these rules and of the related rule that "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Rule 56(c)(2). The form in which the evidence is presented for summary judgment purposes might not be admissible. For example, depositions and affidavits may or may not be admissible as such. But if a party has no ability to prove a fact discussed in the deposition or affidavit through some form of admissible evidence, then the Court cannot rely on that fact to find that there is or is not a genuine dispute as to the fact. Suffice it to say that the Court will not base rulings on the summary judgment motions on facts that haven't been shown to be provable through admissible evidence.

This motion also seeks what in substance is an *in limine* ruling on three categories of allegedly inadmissible evidence: (1) evidence that the conduct of Agent Braley, Sgt. Current or Sgt. Grady violated Lakewood Police Department policies or West Metro SWAT Team Standard Operating Procedures; (2) evidence that Sgt. Current or Sgt. Grady were disciplined for policy violations; and (3) evidence of the Incident Review Board Report's recommendations of remedial measures that should be implemented by the Lakewood Police Department. To assist the parties in their trial preparation I will give them my current views on the admissibility of this evidence, bearing in mind that an *in limine* ruling made in advance of trial will sometimes be modified in the context of the specific evidence offered at trial.

I agree with the defendants that evidence regarding the individual officers' violation of the Department's or the SWAT Team's policies is not admissible as to the claims against them.[8] *See Tanberg,* 401 F.3d 1151, 1163-64.  Plaintiff suggests that while such evidence is inadmissible to establish a constitutional violation, it is admissible to show that the officers' conduct was done recklessly and with deliberate indifference to the rights of Mr. Davies. Response, ECF No. 188, at 3.  That is not a meaningful distinction in my view.  Evidence regarding violation of policies will not be admitted.[9]  I also agree that evidence of disciplinary actions taken against the individual officers for violation of Lakewood Police Department policies is inadmissible to establish their culpability.  *Id.*

Regarding the findings and recommendations in the IRB report (which itself is subject to a hearsay objection), I begin with Rule 407 of the Federal Rules of Evidence which provides:

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove
>
> - negligence;
> - culpable conduct;

---

[8] This does not, of course, mean that evidence concerning the Department's policies, customs and practices is inadmissible with respect to the claims against the City.

[9] That is a somewhat different issue than the admissibility of evidence concerning officers' training. Tenth Circuit law concerning the admissibility of training materials in an excessive force case is not entirely clear.  *Compare Giannetti v. City of Stillwater,* 216 F. App'x 756, (10th Cir. 2007) (unpublished) (training materials not admitted, citing *Tanberg*) *with Weigel v. Broad,* 544 F.3d 1143, 1155 (10th Cir. 2008) (defendant officer's training concerning the Tenth Circuit's previous discussion of the dangers of hog-tying techniques was relevant to the "clearly established law" prong of the qualified immunity doctrine) *and Estate of Booker v. Gomez,* 745 F.3d 405, (10th Cir. 2014) (training concerning the use of a carotid restraint was relevant to the reasonableness of the officer's conduct).  Judge Browning found these cases incompatible and concluded that the two cases that were both more recent and published were more persuasive.  *United States v. Rodella,* No. CR14-2783 JB, 2014 WL 6634391, at **9-11 (D.N.M. Nov. 20, 2014).  My view is that an officer's training is relevant to the reasonableness of his conduct, and admissible, but that failure to comply with training is not determinative of whether his conduct in a particular context was objectively unreasonable or deliberately indifferent.  I note that defendant Braley's experts also cite officers' training in support of their opinions.

. . .

But the court may admit this evidence for another purpose, such as impeachment or – if disputed – providing ownership, control, or the feasibility of precautionary measures.

The focus of the rule is on remedial <u>measures</u>. Thus, for example, if a customer slips and falls on ice in the store's parking lot, the fact that the store owner then removes the ice or sands the icy area would not be admissible to prove that it was negligent not to have done so before the accident. Otherwise, the owner might refrain from correcting the problem for fear that doing so would be viewed as an implicit admission of fault.

Defendants state that, unlike three other post-incident investigations which concerned the facts of what happened (to which defendants apparently do not object), the IRB investigation was conducted solely to identify remedial measures that the Lakewood Police Department should take to ensure that a similar tragedy would not happen again. If that is the case, and if convening the IRB was done voluntarily by the Department in order to obtain recommendations for improvements to its procedures, then I would find that the IRB investigation is the equivalent of a subsequent remedial measure and, therefore, is inadmissible. Regardless, I am not inclined to admit evidence of any remedial measures that were recommended in this study. Please note, what is good for the goose is good for the gander. The Court's restrictions on references to the IRB investigation and report will be applied equally to the defendants and their experts.

In general, however, to the extent that post-incident investigations resulted in findings as to the facts of what occurred, they would be relevant to the jury's fact-finding mission like any investigation of an accident after the fact. *See Rocky Mountain Helicopters, Inc. v. Bell Helicopters Textron, a Division of Textron, Inc.,* 805 F.2d 907, 918 (10th Cir. 1999). Also, to the

extent these investigations show what the Department's policies, customs or practices were at the time of the incident, they potentially would be relevant and admissible on the "Monell" issue.

## ORDER

1. Motion #166 is GRANTED IN PART, DENIED IN PART.

2. Motion #181 is GRANTED IN PART, DENIED IN PART.

3. Motion #179 is DENIED.

4. Motion #187 is GRANTED IN PART, DENIED IN PART.

5. Motion #171 is DENIED.

6. Motion #168 is GRANTED IN PART, DENIED IN PART.

DATED this 16th day of February, 2016.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge